**Raymond LEE, Plaintiff,**

v.

**Thomas A. COUGHLIN, III, Commissioner, James Mahoney, Hearing Officer, Defendants.**

No. 93 CIV. 8417(SS).

United States District Court,
S.D. New York.

Oct. 26, 1998.

David C. Leven, Robert Selcov, Prisoners' Legal Services of New York, Poughkeepsie, NY, Daniel L. Greenberg, John Boston, The Legal Aid Society, Prisoner's Rights Project, New York, NY, for Plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York, New York, NY (Evan A. Gordon, David M. Monachino, Of Counsel), for Defendants.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

In an Opinion and Order dated September 28, 1995, this Court granted plaintiff's cross-motion for summary judgment against defendant James Mahoney, holding that defendant Mahoney had violated plaintiff's due process rights in a prison disciplinary hearing and that the defendant was not entitled to qualified immunity for his actions. At the Court's invitation, the defendants moved for, and the Court granted, reconsideration of its decision based upon *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which had been decided while the motions for summary judgment were *sub judice*. On the basis of the extensive factual record developed by experienced counsel representing both sides in this action, the Court now finds that plaintiff's 376–day segregated confinement constituted an "atypical and significant hardship" as that term was given meaning in *Sandin*.

### PROCEDURAL BACKGROUND

Although the parties have amassed a voluminous record[1] on the *Sandin* issue raised

1. Because the factual issues raised in this case will be addressed in many other federal cases in this state, the Court has directed that all of the exhibits submitted with and in opposition to the motion for reconsideration, as well as pertinent deposition transcripts, be docketed. This filed evidentiary record and the designations to the record that the Court will use herein are as follows:

The submissions of the defendants are attached as exhibits to their Notice of Motion for Summary Judgment dated September 11, 1996. The exhibits are:

Exhibit A, the Affidavit of June Duffy ("Duffy Aff."), Assistant Attorney General, which describes the background of the plaintiff's disciplinary hearing and Article 78 proceeding. Exhibit B, the Affidavit of Anthony J. Annucci ("Annucci Aff."), Deputy Commissioner and Counsel for the New York State Department of Correctional Services ("DOCS"), which describes New York State's prison system, its conditions of confinement and disciplinary system.

The plaintiff has submitted the following declarations and affidavits in opposition to the defendants' motion for summary judgment in a bound volume:

Declaration of Robert Selcov ("Selcov Aff."), plaintiff's attorney, which describes the Plaintiff's Exhibits in Opposition to Defen-

dant's Renewed Motion for Summary Judgment. Plaintiff's exhibits are provided to the Court in three separately bound volumes. The exhibits from the four depositions submitted by the plaintiff were numbered sequentially as 1–19. Additional exhibits, 20–38, are discovery materials, as well as relevant statutory materials including prison directives. Exhibit 39 is a compilation of photographs comparing Sing Sing and Southport Correctional Facilities taken by plaintiff's attorneys during inspection tours. The Plaintiff Exhibits will be referenced by number in this Opinion as "Pl.Ex. ___".

Affidavit of Raymond Lee ("Lee Aff."), the plaintiff, which describes the conditions of his confinement at Sing Sing and Southport. Declaration of John Boston ("Boston Decl."), plaintiff's attorney, which describes New York State's disciplinary regulations and rules, and provides charts and a statistical analysis of the prison population, disciplinary hearings and imposed confinement sentences.

Declaration of Steve J. Martin ("Martin Decl."), consultant in correctional administration, which describes the history and purpose of punitive segregation and provides an evaluation of such confinement in New York. Affidavit of Stuart Grassian, M.D. ("Grassian Aff."), psychiatrist, which describes the psy-

by this case, the material facts underlying this motion are not substantially in dispute.

The background of this action is more fully set forth in this Court's Opinion and Order dated September 28, 1995, familiarity with which is presumed. *Lee v. Coughlin*, 902 F.Supp. 424 (S.D.N.Y.1995) [hereinafter *Lee I* ]. Repeated herein are only those facts pertinent to understanding the current issues before the Court.

On June 9, 1992, the plaintiff was issued a misbehavior report for allegedly assaulting another inmate and was confined to his cell at Sing Sing Correctional Facility ("Sing Sing"). After the conclusion of a Tier III superintendent's hearing on July 9, 1992, the plaintiff was found guilty, and sentenced to and placed in the Special Housing Unit ("SHU") at Sing Sing for a two-year term. Plaintiff remained in SHU at Sing Sing until his transfer to SHU at Southport Correctional Facility ("Southport") on July 23, 1992. Plaintiff filed an Article 78 petition in the Supreme Court of the State of New York, Westchester County, on December 22, 1992. By Order dated May 21, 1993, Justice James R. Cowhey annulled the plaintiff's disciplinary disposition in all respects and ordered the defendants to expunge plaintiff's records based upon "the conflicting evidence coupled with denial of [the plaintiff's] right to meaningful assistance" with his defense. *Lee I*, 902 F.Supp. at 428 (quoting the state court decision). Plaintiff was ordered released from SHU and transferred from Southport to general population at Great Meadow Correctional Facility on June 21, 1993. Plaintiff had served 376 days in segregation confinement at the time of his release from Southport SHU: 14 days at Sing Sing and 362 days at Southport. Plaintiff, *pro se*, filed the instant civil rights complaint on December 8, 1993.

By Opinion and Order dated September 28, 1995, this Court granted plaintiff's cross-motion for summary judgment, finding that plaintiff had been deprived of an employee assistant to prepare for his Tier III superintendent's hearings in violation of his due process rights. *See Lee I*, 902 F.Supp. at 435. Because defendants had not moved to supplement the record after *Sandin* was decided, I assumed in *Lee I* that the 376-day segregation at Southport was an "atypical" hardship, but invited the defendants to move to reargue under *Sandin*, if grounds existed to do so. *See Lee I*, 902 F.Supp. at 431 n. 9.

The Court granted defendants' motion for reconsideration on January 2, 1996. *Lee v. Coughlin*, 914 F.Supp. 1004 (S.D.N.Y.1996) ("*Lee II* "). In the interim, *pro bono* counsel appeared for plaintiff and the Court permitted the parties to conduct extensive discovery on the *Sandin* issue. After the completion of discovery, defendants filed their renewed motion for summary judgment on September 11, 1996. Plaintiff and defendants responded to their respective submissions,[2] and on May 19, 1997, the Court heard oral argument on defendants' renewed motion.

## FACTS

In order to analyze the facts concerning segregated confinement in correctional facilities in New York State, familiarity with the regulations governing the imposition of discipline for inmates in the New York State

---

chological effects of solitary and small group confinement.

Four depositions have also been filed:

Brant Kehn ("Kehn Dep."), Deputy Superintendent for Programs at Sing Sing Correctional Facility.

Richard Martin ("Martin Dep."), Assistant Director of the Management Information System for DOCS.

Richard Morse ("Morse Dep."), the Deputy Superintendent of Security at Southport Correctional Facility.

Donald Selsky ("Selsky Dep."), the Director of Special Housing and Inmate Discipline for DOCS.

2. In their reply to the plaintiff's papers in opposition to the renewed motion for summary judgment, the defendant for the first time raised the argument that Section 803(d) subsection (e) of the Prison Litigation Reform Act (PLRA) precluded the plaintiff from recovering damages for emotional injuries without physical harm. By Order dated November 7, 1996, I granted the plaintiff the right to surreply to this new issue. The defendant subsequently withdrew this argument from the Court's consideration. *See* Letter of Assistant Attorney General Evan A. Gordon dated November 27, 1996 (Doc. No. 54, Docketed Aug. 25, 1997).

Department of Correctional Services ("DOCS") is necessary.

## A. The New York Prison Disciplinary Regime

N.Y. Comp.Codes R. & Regs. tit. 7 [hereinafter 7 NYCRR] § 270.3 (1996) sets forth a three-"tier" system of prison discipline. Significant misbehavior results in significant punishment. Concomitantly, the amount and nature of the process the state affords is dependent upon the potential sentence the prisoner may receive.

Tier I violation hearings cannot result in sanctions of confinement; penalties are limited to loss of privileges or assignment of extra work for up to thirteen days. At a Tier I hearing, a prisoner may be present, may offer documentary evidence and may submit a written statement, but may not present witnesses. Appeals are to the Superintendent. Records of these proceedings are destroyed after fourteen days. *See* 7 NYCRR § 252.

Disposition of a Tier II disciplinary hearing may result in the same penalties available for a violation under Tier I; additionally, however, prisoners may be confined in a cell or room, or in a special housing unit for up to thirty days. A $5.00 automatic surcharge is collected upon a finding of guilt. At a Tier II hearing, a prisoner has the right to an employee assistant, to call witnesses, and to have the hearing electronically recorded. Appeals are to the Superintendent. *See* 7 NYCRR § 253.

A Tier III superintendent's hearing may result in the same penalties available for a violation under Tier II; in addition, a prisoner may be confined in a cell or room or in a special housing unit **without limitation.** *See* 7 NYCRR § 254 (emphasis supplied). Furthermore, prisoners may lose good time credit. Appeals are to the Commissioner of DOCS. *See id.*

Tier III superintendent's hearings are conducted by higher-ranking officials than Tier II hearings. *See id.* Appeals to the Commissioner are handled statewide by the Director of Special Housing, Donald Selsky, who exercises substantial discretion in re-

viewing both the determination of guilt and the propriety of the penalty. (Selsky Dep. at 8–9.) Of 25,661 Tier III reported hearings in 1994, Selsky reviewed 6899 on appeal. (Pl. Ex. 1.) The Director of Special Housing does not review Tier I or Tier II dispositions. (Selsky Dep. at 6.)

Three forms of punitive confinement exist in New York: placement in SHU, keeplock, which is confinement to the prisoner's cell, and cube, which is confinement to the prisoner's own bed in dormitory housing. (Selsky Dep. at 37.)

In addition to discipline, prisoners may be placed in SHU for the following reasons: detention prior to a hearing or on receipt from another correctional facility if the inmate's record raises reasonable questions concerning willingness to adhere to prison rules, [ NYCRR] § 301.3(a)(1)-(2); administrative segregation if the facility has determined that the "inmate['s] presence in general population would pose a threat to the safety and the security of the facility," *id.,* § 301.4; protective custody, *id.,* § 301.5; keeplock admissions for various reasons in minimum or medium security facilities, *id.,* § 301.6; and for other reasons, *id.,* § 301.7(a). The regulations direct prison officials to review a detention admission at least once every twenty-four hours. *Id.,* § 301.3(c) Inmates placed in administrative segregation must have their status reviewed every seven days for the first two months and every thirty days thereafter by a three-person committee. *Id.,* § 301.4(c). Inmates placed into involuntary protective custody receive a hearing within fourteen days and a review every thirty days thereafter. *Id.,* § 330.3(b) Finally, an inmate admitted to the SHU for any other reason must be allowed a meeting with the Superintendent's designee concerning his or her placement. *Id.,* § 301.7(a).

*Justice v. Coughlin,* 941 F.Supp. 1312, 1320 (N.D.N.Y.1996).

## B. Statistics on Prison Discipline in New York

Both parties contest the atypicality of plaintiff's confinement in SHU for 376 days

and argue that the undisputed statistical data submitted supports their respective positions.[3] The defendants maintain that SHU confinements of significant duration are a common experience of prison life. As of June 26, 1995, 1,595 prisoners were serving SHU sentences of the following duration:

| Duration of SHU Sentence | Number of Inmates | Percentage of Confinements |
| --- | --- | --- |
| <59 Days | 28 | 1% |
| 60–119 Days | 143 | 9% |
| 120–179 Days | 140 | 9% |
| 180–365 Days | 655 | 41% |
| >365 Days | 629 | 40% |

(Annucci Aff. ¶ 12.) From these statistics, the defendants submit that the inmate population confined in disciplinary SHU in New York State for periods of more than six months is over 80% of the SHU population on any given day. Therefore, defendants argue, extensive confinement in segregated housing is a typical, ordinary and expected incident of prison life in New York State.

The plaintiff contends that this isolated "snapshot" view of the number of inmates in SHU on one day is misleading and not meaningful in terms of the standard set by *Sandin*. Plaintiff maintains that under *Sandin*, the percentage of inmates serving disciplinary sentences in SHU over time and their length of confinement must be measured against the general prison population, which constitutes the reference point for comparing the ordinary incidents of prison life. Plaintiff compares the number of inmates in DOCS custody over a period of time (those who could have been sentenced to SHU during that time) against both the number who actually were sentenced to SHU during that period and the length of the prisoner's time in segregated confinement. From this perspective, in 1993, 97,537 prisoners were under DOCS custody for part or all of that year; 4,064 prisoners, 4.2%, were sentenced to SHU, but only forty-nine (49), 0.05% of the general population, received SHU sentences like plaintiff's, of over two years. Only 526, 0.5%, of the general population, received SHU sentences of one year or more, the time plaintiff actually served.[4] (Boston Decl. ¶¶ 7–9.) In 1994, 99,126 prisoners were under DOCS custody for part or all of that year; 4,816, 4.8%, were sentenced to SHU, but only 123, 0.12% of the general population, received SHU sentences of two years or more, and only 689, 0.7% of the general population, received SHU sentences of one year or more. (*See id.*)

Looking at the statistics from another perspective, plaintiff maintains that Tier III hearings are atypical because they represent a small percentage of DOCS disciplinary proceedings. Tier I and II hearings, which can result in no greater than thirty (30) days in SHU, were between 84% and 85% of the hearings held from 1993 to 1995.[5] (Boston Decl. ¶ 10b.)

3. At oral argument, the defendants conceded that no dispute exists regarding the statistics cited and relied upon by plaintiff. (*See* Transcript of Argument held on May 19, 1997, at 6–7 [hereinafter Tr.].)

4. The Boston Declaration at Paragraph 15 explains that the actual served sentences in SHU are substantially less than the sentences imposed because many such sentences are suspended (in 1993—17.2%, in 1994—20.3%, and in 1995— 19.4% of the SHU sentences imposed were wholly or partly suspended), and others, like plaintiff's, are administratively reversed or modified.

5. In 1993, 169,633 misbehavior reports were written in New York state prisons; in 1994, 174,027 misbehavior reports were written. (Boston Decl. ¶ 10a.) The number of hearings held each year differs from the number of reports by about six (6) percent for various reasons, such as consolidation of multiple reports in one hear-

| | 1993 | % of Hearings | 1994 | % of Hearings | 1995 | % of Hearings |
|---|---|---|---|---|---|---|
| Tier I | 59,254 | 37.0% [6] | 58,887 | 36.3% | 64,624 | 37.4% |
| Tier II | 76,476 | 47.7% | 77,597 | 47.9% | 80,631 | 46.7% |
| Tier III | 24,751 | 15.3% | 25,556 | 15.8% | 27,579 | 16.0% |
| Total | 160,481 | | 162,040 | | 172,834 | |

(Boston Decl. ¶ 10b.) Thus, Tier III hearings approximate only 15% of the total hearings held in any year.

The vast majority of confinement sentences resulting from Tier II and Tier III hearings, almost 90%, were to keeplock (confinement in one's own cell) and to cube confinement (confinement to one's own living area in a dormitory housing area) as opposed to segregated confinement:

| | Prisoners Sentenced to Confinement | Prisoners Sentenced to SHU | |
|---|---|---|---|
| 1993 | 39,627 | 4604 | 11.6% |
| 1994 | 39,745 | 4816 | 12.1% |
| 1995 | 40,879 | 4598 | 11.2% |

| | Confinement Sentences | SHU Sentences | |
|---|---|---|---|
| 1993 | 62,045 | 5937 | 9.6% |
| 1994 | 62,576 | 6311 | 10.1% |
| 1995 | 64,788 | 6093 | 9.4% |

(Boston Decl. ¶ 10e; Pl. Ex. 7, at 1.)[7]

---

ing. For a fuller explanation of reasons, *see* Boston Decl. n .5.

**6.** Generally, percentages have been rounded to the nearest tenth of a percentage point.

**7.** Each of the tables is created from the materials contained in the cited sources. The Court has calculated many of the percentages contained in the tables from the statistics provided.

| | Prisoners Sentenced to Confinement | Prisoners Sentenced to Keeplock | |
|---|---|---|---|
| 1993 | 39,627 | 27,883 | 70.4% |
| 1994 | 39,745 | 28,156 | 70.8% |
| 1995 | 40,879 | 28,585 | 69.9% |

| | Confinement Sentences | Keeplock Sentences | |
|---|---|---|---|
| 1993 | 62,045 | 47,328 | 76.2% |
| 1994 | 62,576 | 47,926 | 76.6% |
| 1995 | 64,788 | 49,303 | 76.1% |

(Pl.Ex. 7, at 1.)

| | Prisoners Sentenced to Confinement | Prisoners Sentenced to Cube | |
|---|---|---|---|
| 1993 | 39,627 | 7140 | 18.0% |
| 1994 | 39,745 | 6773 | 17.0% |
| 1995 | 40,879 | 7696 | 18.8% |

| | Confinement Sentences | Cube Sentences | |
|---|---|---|---|
| 1993 | 62,045 | 8780 | 14.2% |
| 1994 | 62,576 | 8339 | 13.3% |
| 1995 | 64,788 | 9392 | 14.5% |

(*Id.*)

The proportion of SHU sentences as long as plaintiff's two-year sentence does not exceed one-half of one percent of the total number of confinement sentences in any of the years reviewed, 1993–1995. Even if plaintiff's sentence is viewed as the 376 days he actually served instead of the two-year disposition imposed by the hearing officer, sentences of this duration never exceeded 2.2% of the total number of confinement sentences in any year between 1993 and 1995. (Boston Decl. ¶ 11.)

**Prisoners Sentenced to Disciplinary Confinement, 1993–1995**

| Length of Sentence | Type of Sentence | 1993 | | 1994 | | 1995 | |
|---|---|---|---|---|---|---|---|
| | SHU | 49 | 0.1% | 123 | 0.3% | 193 | 0.5% |
| >2 Years | Keeplock | 2 | 0.01% | 7 | 0.02% | 16 | 0.04% |

| Length of Sentence | Type of Sentence | 1993 | | 1994 | | 1995 | |
|---|---|---|---|---|---|---|---|
| | Cube | 0 | 0.0% | 0 | 0.0% | 1 | 0.002% |
| | SHU | 477 | 1.2% | 566 | 1.4% | 715 | 1.7% |
| 1–2 Years | Keeplock | 16 | 0.04% | 36 | 0.09% | 115 | 0.3% |
| | Cube | 0 | 0.0% | 1 | 0.003% | 0 | 0.0% |
| | SHU | 1138 | 2.9% | 1211 | 3.1% | 1168 | 2.9% |
| 6 Months – 1 Year | Keeplock | 194 | 0.5% | 263 | 0.7% | 568 | 1.4% |
| | Cube | 7 | 0.02% | 2 | 0.01% | 8 | 0.02% |
| | SHU | 2198 | 5.5% | 2045 | 5.1% | 1668 | 4.1% |
| 1 Month – 6 Months | Keeplock | 6741 | 17.0% | 6875 | 17.3% | 7578 | 18.5% |
| | Cube | 1326 | 3.3% | 828 | 2.1% | 1123 | 2.7% |
| | SHU | 742 | 1.9% | 871 | 2.2% | 854 | 2.1% |
| 30 Days | Keeplock | 20,930 | 52.8% | 20,975 | 52.8% | 20,308 | 49.7% |
| | Cube | 5807 | 14.7% | 5942 | 15.0% | 6564 | 16.1% |
| Total | | 39,627 | | 39,745 | | 40,879 | |

(Pl.Ex. 7, at 8–10.)

### Total Confinement Sentences, 1993–1995

| Length of Sentence | Type of Sentence | 1993 | | 1994 | | 1995 | |
|---|---|---|---|---|---|---|---|
| | SHU | 72 | 0.1% | 167 | 0.3% | 258 | 0.4% |
| > 2 Years | Keeplock | 2 | 0.003% | 11 | 0.02% | 30 | 0.05% |
| | Cube | 0 | 0.0% | 0 | 0.0% | 1 | 0.001% |
| | SHU | 613 | 1.0% | 762 | 1.2% | 973 | 1.5% |
| 1–2 Years | Keeplock | 30 | 0.05% | 61 | 0.1% | 179 | 0.3% |
| | Cube | 0 | 0.0% | 1 | 0.002% | 0 | 0.0% |
| | SHU | 1428 | 2.3% | 1568 | 2.5% | 1569 | 2.4% |
| 6 Months– 1 Year | Keeplock | 338 | 0.5% | 414 | 0.7% | 922 | 1.4% |
| | Cube | 7 | 0.01% | 2 | 0.003% | 8 | 0.01% |

| Length of Sentence | Type of Sentence | 1993 | | 1994 | | 1995 | |
|---|---|---|---|---|---|---|---|
| | SHU | 2950 | 4.8% | 2750 | 4.4% | 2293 | 3.5% |
| 1 Month–6 Months | Keeplock | 11,487 | 19.1% | 12,413 | 19.8% | 13,734 | 2 1.2% |
| | Cube | 1546 | 2.5% | 1003 | 1.6% | 1296 | 2.0% |
| | SHU | 874 | 1.4% | 1064 | 1.7% | 1000 | 1.5% |
| 30 Days | Keeplock | 35,111 | 56.6% | 35,027 | 56.0% | 34,438 | 53.2% |
| | Cube | 7227 | 11.6% | 7333 | 11.7% | 8087 | 12.5% |
| Total | | 62,045 | | 62,576 | | 64,788 | |

(Pl.Ex. 7, at nonsequentially numbered last three pages.)

---

### C. Life in General Population and In Segregated Confinement

As of August 1998, there were fourteen maximum security facilities, thirty-two medium security facilities, sixteen minimum security facilities, and five multi-level security facilities in the State of New York.[8] Both Sing Sing and Southport contain maximum security facilities; beyond that, however, there are few similarities between the two institutions. As of September 1995, Sing Sing had 1780 inmates; Southport had 765.[9]

Overall, the nature and extent of programs and activities at Sing Sing are typical of Department of Correctional facilities statewide. (Kehn Dep. at 10.) The DOCS guide to the process of programming inmates is called Policy Procedures and Standards for Programming Inmates. "Programming" benefits both the facility and the inmate; the facility gains by having inmates positively involved in an activity, work or a program as opposed to being idle in their cell or the recreation yard. (*See id.* at 12.) Likewise, programs have an important impact on both the rehabilitation of prisoners and an inmate's ability to manage prison life. (*See id.* at 13.)

New inmates entering a facility go through a reception orientation phase. When finished, inmates go to the program committee, which then develops a program plan. The program orientation manual states that "incoming General Confinement inmates will be seen by the program committee within ten working days." Pl.Ex. 14 at 8. Sometime after seeing the program committee, the inmate is assigned to a job or a program. (Kehn Dep. at 6.)

Sing Sing maintains full, two-module programming, offering the following four types of inmate programs: academic programs, vocational programs, substance and alcohol abuse programs, and work assignments. (Kehn Dep. at 7.) With the exception of "master counts" at 11:00 a.m. and 4:00 p.m., which last about half an hour each, inmates in general population may be allowed out of their cells from breakfast at 7:15 a.m. until the last master count in the evening at 10:00 p.m. (Pl.Ex. 16.)

8. The breakdown of facilities by security levels is taken from the tables in Pl.Ex. 12, and was independently confirmed by a call from the Court to DOCS.

9. According to the deposition testimony of Richard Morse, Deputy Superintendent at Southport, 641 SHU inmates are housed in SHU at Southport. (Morse Dep. at 9–10.) The remainder of the population are cadres. *See infra* note 8.

Plaintiff's program assignment at Sing Sing was to work as "feed-up man" on his housing unit, which meant that he was responsible for serving meals to those inmates confined to their cells (keeplock). (Lee Aff. ¶ 4.) Plaintiff worked six days per week serving all three meals each day. (*See id.*) Plaintiff left his cell at 6:30 a.m. to assist in serving and clearing meals. (*See id.* ¶ 5.) From 9:00 until 10:45 a.m., he engaged in activities in the recreation room, gymnasium, and outdoor yard. (*See id.* ¶ 7.) After recreation, plaintiff returned to his cell for the master count. (*See id.*) After the count, plaintiff served and then ate lunch. (*See id.* ¶ 9.) After lunch, plaintiff participated in additional recreational activities until the afternoon count. (*See id.* ¶ 10.) Plaintiff again served and ate his evening meal, after which he would attend evening recreation and programs from 6:00 until 9:45 p.m. (*See id.* ¶¶ 11–12.)

During recreation periods, plaintiff could use telephones, watch television, play cards or games with other inmates, or go to the general or law library. (*See id.* ¶ 13.) During evening recreation, inmates could take showers (by New York prison regulations, inmates in general population are to have at least three showers a week (Kehn Dep. at 81–82)), attend meetings and events for inmate organizations, or just fraternize on the gallery. (Lee Aff. ¶¶ 13–14.) At Sing Sing, movies were shown approximately six nights per week. (Kehn Dep. at 34.)

The visiting room at Sing Sing is open every day. Inmates and visitors meet in a large, open room. There is also an outdoor visiting area with picnic tables. (Lee Aff. ¶ 16.) While at Sing Sing, the plaintiff received frequent visits from his family as well as packages of cooked foods. (*See id.* ¶¶ 16–17.) The plaintiff, like other Sing Sing general population inmates, was also permitted to order a wide selection of items from the commissary twice each month, for up to $78.50 per order. (*See id.* ¶ 19.)

In general population, inmates may possess personal property in their cell. Plaintiff had his own clothing, such as a warm winter coat, sweat suits, long johns, gloves and boots, and not just state-issued items. Plaintiff also had a hot pot, food items, a cassette tape player, a radio, personal photographs, and books and other reading material in his cell. (*See id.* ¶ 20.)

Plaintiff's day-to-day routine in general population at Sing Sing came to an end when he was charged with misbehavior and confined to his cell on June 9, 1992. As a result of the hearing challenged in this case, plaintiff was placed in SHU at Sing Sing after the conclusion of his Tier III superintendent's hearing on July 9, 1992. Plaintiff remained in SHU at Sing Sing for two weeks until he was transferred to Southport on July 23, 1992. (*See id.* ¶ 21–22.) Upon admission to SHU at Sing Sing, inmates are issued a clean state-issued set of clothing, bedding, toilet articles and, upon request, writing materials. (Pl.Ex. 18, at 4–5.) All of an inmate's personally owned items, with limited exception, are confiscated and stored until the inmate is released or transferred from SHU. (*See id.* at 5–6.)

For the first thirty days in SHU, cells are equipped with the minimum requirements: a bed, mattress, toilet and sink. (Selsky Dep. at 27). Within the first twenty-four hours of confinement in SHU, an inmate is permitted one pair of prescription eyeglasses, one prescription hearing aid, and prescription medicines. (*See* DOCS Directive 4933, Pl.Ex. 22, at 4.) After seventy-two hours, inmates are permitted specified religion-related books and artifacts, some stamps and cigarettes, some general books and newspapers, and some personal toiletries. (*See id.* at 5.) After thirty days, if an inmate demonstrates a positive adjustment, he is permitted a deck of cards, earphones, additional books and other personal items, and an opportunity to make purchases at the commissary at 50% of the monthly total permitted general population inmates. (*See id.* at 6.)

Southport is unique in that it is an entirely SHU facility with a limited number of "cadre" inmates.[10] There are no vocational pro-

---

**10.** "Cadre" is the term used to refer to those inmates who are not serving disciplinary sentences and who are assigned to work at the prison. There are 147 cadre inmates at South-

grams at Southport. There is cell study at Southport where inmates can take educational courses like GED. A tutor visits the cells for individual instruction once a week. Southport has a "progressive inmate movement system" with three levels. (Morse Dep. at 12.) Deputy Superintendent Morse explained that the level movement system was "initiated by Commissioner Coughlin after there was a riot or disturbance in 1991, in order to give inmates—reward inmates for good behavior." (*Id.* at 28.)

Generally, the minimum requirement for transfer to Southport is a disciplinary disposition of ninety days SHU confinement.[11] (*See id.* at 75.) The overwhelming majority of inmates sent to Southport finish their SHU confinement there. (*See id.* at 76.) With the exception of a rare cadre inmate's assignment to administrative segregation, there are no administrative segregation or protective custody inmates held at Southport. (*See id.* at 76–77.)

In Southport, except for one unit, no cells face each other. The cells have solid doors with a view window where an officer can see the inmate, and a feed-up patch. (Morse Dep. at 14.)

The plaintiff's regime at Southport was typical of other Southport SHU inmates. Southport has a three-level assignment system. The SHU prisoners at Southport are initially assigned to Level 1 and can gradually move to the higher levels if they do not engage in misconduct while at Southport. (Lee Aff. ¶ 23.) The fronts of the cells for Level 1 are partially covered with a plexiglass shield. (*See id.* ¶ 24.) Inmates on Level 1 remain in restraints whenever they are taken from their cells. (*See id.*) Even during the one hour of exercise per day and

during visits, inmates on Level 1 remain in handcuffs chained to a waist belt and leg irons because of an exception that has been granted to Southport from the statewide regulations governing use of restraints. (Morse Dep. at 32.) SHU inmates have exercise, albeit in "exercise units," cage-like structures that measure eight feet wide, sixteen feet long and twelve feet high, and have no equipment. (*Id.* at 36–38.) When asked to what extent inmates are able to exercise when they are in restraints at Southport, Deputy Superintendent Morse answered, "They can walk." (*Id.* at 39.)

Level 2 conditions at Southport are slightly less severe. Inmates do not remain handcuffed during the exercise period or in the visiting room, although handcuffs are still applied whenever the inmate is taken outside his cell. (Lee Aff. ¶ 25.) Unlike Level 1, there is no plexiglass covering the cell front on Level 2. (*See id.*) Showers, limited to ten minutes measured from when the inmate is in the water out of restraints, are given twice per week in Levels 1 and 2. (*See id.* ¶ 29; Morse Dep. at 43.) If an inmate wants to shave, he must do so when he showers. (Morse Dep. at 43.)

Plaintiff was moved to Level 3 after ninety days in Level 2. (Lee Aff. ¶ 26.) Waist chains are not used on Level 3 inmates when they are taken from their cells, unless they are taken off the unit. (*See id.*) Only Level 3 inmates can order candy from the commissary, and they are permitted personal shorts and sneakers. (*See id.*) Unlike general population inmates, SHU inmates are not permitted personal clothing—with only the limited exceptions for Level 3 described above—and are issued clothing that the plaintiff claims was inadequate to keep him warm during his one-hour exercise period in the

---

port. Approximately 50 work in the mess hall. (Morse Dep. at 52.)

**11.** The written policy and testimony of correctional officials differed concerning the minimum SHU sentence required for transfer to Southport. *See, e.g.,* Morse (the Southport Deputy Superintendent) Dep. at 9 (90 days); Selsky (the Director of Special Housing) Dep. at 91–95 (90 days is

formal minimum but 120 days is actual practice); Pl.Ex. 38 (Sing Sing's Written Policy About Transfers to Southport) at 1 (120–day minimum); Kehn (Deputy Superintendent for Programs at Sing Sing) Dep. at 86 (one year). These differences are not pertinent to the motion before the Court because clearly only prisoners given lengthy Tier III SHU confinements of at least 90 days are eligible for transfer to Southport.

winter, thereby forcing him often to forego his exercise time. (*Id.* ¶ 30.) All incidents of life are affected by Southport's policy on restraints. Plaintiff had blood work taken, and a chest x-ray, an EKG and dental work performed while handcuffed to a waist chain. (*Id.* ¶ 28.)

The visiting room at Southport is open only on weekends and holidays. (Lee Aff. ¶ 31; Morse Dep. at 46.) Only thirty-eight SHU inmates can receive a visit at one time. (Morse Dep. at 47.) SHU inmates in both Sing Sing and Southport are limited to one non-legal visitor a week, as opposed to unlimited visits the entire week in general population. (Kehn Dep. at 75.) The visiting room at Southport is divided into four areas by steel mesh walls. (Lee Aff. ¶ 31.) About eight inmates are locked into each area, separated from their visitors by a partition and wire mesh screen. (*Id.*) A small room to one side accommodates six additional inmates. (Morse Dep. at 47.) Only a small slot, two inches by two inches, is open between the table top and the screen, where the inmates and visitors can have limited contact. (Lee Aff. ¶ 31; Morse Dep. at 49).

Other than the limited visits provided on weekends, the ten-minute showers and for medical treatment, inmates at SHU in Southport and elsewhere spend twenty-three hours a day in their confined cells. (Lee Aff. ¶ 29.) They can only eat, sleep, read, and write in their cells. (*See id.*) They may speak to, but cannot see, other inmates within hearing distance. (*See id.*) They may participate in cell study (Morse Dep. at 66) and can request a spiritual advisor to visit their cell. (*Id.* at 70.) Inmates in Sing Sing SHU can order from the commissary (Pl.Ex. 18, at 7), but Southport has commissary only for cadre (Morse Dep. at 71) and Level 3 inmates. (Lee Aff. ¶ 26.)

SHU at Sing Sing has similar conditions to those existing at Southport except prisoners in Sing Sing SHU have congregate exercise in an outdoor yard (weather permitting) and are not subject to the caged exercise. (Kehn Dep. at 72; Morse Dep. at 42; Selsky Dep.

at 32.) The SHU yard in Sing Sing has a basketball hoop, handball wall, chinning bar and an area where quiet games are provided and can be played. (Kehn Dep. at 73.) The exercise units in Southport are empty. (Morse Dep. at 36–38.) Furthermore, SHU inmates in Southport must request exercise when the officer takes the morning count, or else they do not get exercise that day. (*Id.* at 42.)

The plaintiff has described his experience at Southport as follows:

> I found the conditions in the SHU at Southport to be very extreme and hard to withstand. This was the only time during my entire sentence that I have been in SHU for more than a week or two. When I went to the exercise cages, I felt as if I was an animal in a zoo. I asked my parents not to visit me because of the conditions in the visiting room and the limited contact that was permitted between us. Some days, I would refuse to engage in any out of cell activity because I found the shackling procedure to be humiliating. I also refused to have my hair cut because I had to remain in handcuffs during the procedure. Prior to my experience at Southport I did not image [sic] that such severe conditions would be imposed in any New York State prison.

(Lee Aff. ¶ 32.)

### D. Other Special Housing Admissions

In addition to disciplinary segregation, there are five other kinds of admission to special housing: detention admission, administrative segregation, protective custody, keeplock and "other" admissions. (Selsky Dep. at 52; Pl.Ex. 22, at 1–3.) No data is kept by the DOCS on the duration and frequency of these other categories of special housing admissions. (Martin Dep. at 41–42; Selsky Dep. at 58–59.) Southport does not hold prisoners in any of these nondisciplinary categories. (Morse Dep. at 76–77.)

#### 1. *Detention Admission*

An inmate is typically admitted for detention prior to a hearing or on receipt from another correctional facility if the inmate's

record "raises a reasonable question as to whether he is ready to adhere to the department's rules and policies." 7 NYCRR § 301.3(a)(2). The typical duration for this type of detention admission to special housing is fourteen days or less. (Selsky Dep. at 52–53.) Generally, however, a prisoner is only kept in special housing as a "detention admission" for two or three days. (*Id.* at 54.) If the inmate is to be retained in special housing past this time, other action is usually taken against the inmate; for instance, a misbehavior report might be written, or corrections officials might choose to move the inmate into administrative segregation. (*Id.*) If a misbehavior report or a notice directing involuntary administrative or protective custody has not been issued, the facility's deputy superintendent of security must review the detention admission inmate's status at least once every twenty-four hours. *See* 7 NYCRR § 301.3(c).

### 2. *Administrative Segregation*

As set forth in 7 NYCRR Section 301.4(b), "[A]dministrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility." Mr. Selsky elaborated on why and how an inmate would be placed in administrative segregation:

> The inmates assigned to administrative segregation have generally been determined to have been involved in some type of disruptive behavior; maybe not the type that would at this time result in a disciplinary determination or report being written which the type of misconduct that the executive staff of the facility believe would be disruptive, but perhaps organizing some group action, and there's a belief that this person shouldn't be in general population.

(Selsky Dep. at 56.)

Mr. Selsky also testified that DOCS policy is not to keep prisoners in administrative segregation unless it is necessary to do so. (*See id.* at 58–59.) As a result, there are generally only about fifty prisoners in administrative segregation in the entire New York State prison system at any given time. (*See id.* at 62.) As noted, inmates assigned to administrative segregation are entitled to a hearing within fourteen days of admission, *see* 7 NYCRR § 301.4(a), and to have their status reviewed every seven days for the first two months, and every thirty days thereafter by a three-person committee. *See* 7 NYCRR at § 301.4(d). When asked, "What is the longest period of administrative segregation that has been brought to your attention in the last calendar year?" Mr. Selsky responded: "I guess one inmate who sticks out in my mind has been William Blake. Other inmates have been—I think he might be the longest.... He has been in administrative segregation since he came back in departmental custody, 1987, periodically through that time but for the most part, administrative segregation status." (Selsky Dep. at 60–61.)

There are three reported cases concerning inmate Blake's placement in special housing. Two of the cases, *Blake v. Mann,* 145 A.D.2d 699, 535 N.Y.S.2d 240 (N.Y.App.Div.1988), and *Blake v. Mann,* 75 N.Y.2d 742, 551 N.Y.S.2d 888, 551 N.E.2d 89 (N.Y.1989), concerned the inmate's placement in involuntary protective custody. Those cases held that the prison regulations governing involuntary protective custody authorized the placing of the plaintiff in such custody because he was a threat to institutional safety and security, and because the placement was supported by the record. *See* 145 A.D.2d at 701, 535 N.Y.S.2d 240, 75 N.Y.2d at 743, 551 N.Y.S.2d 888, 551 N.E.2d 89. Only the third case, *Blake v. Coughlin,* 189 A.D.2d 1016, 592 N.Y.S.2d 519 (N.Y.App.Div.1993), concerned Mr. Blake's placement in administrative segregation. The court held that although plaintiff was impermissibly denied his right to call witnesses, the requirements of due process were adequately satisfied and DOCS' decision to administratively segregate inmate Blake was upheld. *See* 189 A.D.2d at 1018, 592 N.Y.S.2d 519. Mr. Selsky's memory regarding Mr. Blake's segregation status points out the interchangeable use of non-

disciplinary confinement by New York's corrections officials.

### 3. *Protective Custody*

Protective custody inmates held in Sing Sing are entitled to services and privileges equivalent to those in general population (Martin Decl. ¶¶ 28–31), though services are generally provided on the unit itself. (Kehn Dep. at 52–53.) Protective custody units have common areas with tables where prisoners are permitted to socialize, eat their meals together and watch television. (Martin Decl. ¶¶ 28–31.) State regulations prescribe a minimum of three hours per day of out-of-cell time for such inmates. *See* 7 NYCRR § 330.4(a). Sing Sing actually provides six hours and thirty minutes out of cell for protective custody segregation inmates. (Pl.Ex. 37, at 11.) Protective custody inmates are permitted to attend congregate religious services and congregate recreation, have the same number of visits as general population inmates, are eligible for the Family Reunion Program, and have equivalent telephone, commissary and package privileges as general population inmates. Protective custody inmates may keep their personal property just as general population inmates may. (Martin Decl. ¶¶ 28–31.) Indeed, DOCS considers protective custody units not to be special housing units, and "[doesn't] encourage" using special housing units for protective custody. (Selsky Dep. at 62–63.)

### 4. *Keeplock and Cube Admissions*

Keeplock admission is governed by 7 NYCRR § 301.6; however, this section only pertains to inmates in medium or minimum security facilities, not to those in maximum security facilities. The parties never addressed why the regulation specifically excludes maximum security facilities. However, subsection (h) states:

> An inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplocked inmates in that facility.

7 NYCRR § 301.6(h).

Therefore, inmates who are housed in dormitory space in medium or minimum security facilities may be admitted to SHU to await disposition of a disciplinary hearing or to serve the sanction imposed as a result of a disciplinary hearing. *See* 7 NYCRR § 301.6(a)(1)-(2). If not moved to SHU, keeplock is served in one's cell or dorm area (known as "cube confinement").

The parties have not provided evidence describing the conditions in keeplock, but the general conditions of keeplock have been described in other cases:

> Under keeplock, an inmate is confined to his general population cell for 23 hours per day, with one hour reserved for exercise, the same time permitted general population inmates for exercise.... Within the 23 hour period, inmates are permitted to leave their cell for showers, personal and social visits, medical examinations and counseling in the same manner and for the same number of times as general population inmates in a maximum security facility as the one plaintiff was in.... Finally, while in keeplock, inmate are given access to cell study programs, books and periodicals.... The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends.

*Camacho v. Keane,* 1996 WL 204483, at *2 (S.D.N.Y. Apr.25, 1996); *see also Gayle v. Keane,* 1998 WL 187862, at *4 (S.D.N.Y. Apr.21,1998) (same).

As noted, inmates in cube are entitled to the same privileges, and subject to the same restrictions, as inmates in keeplock. (Pl.Ex. 30.)

### 5. *Other Admissions*

An inmate may be admitted to a special housing unit for any other reason, with the approval of the deputy commissioner for facility operations. *See* 7 NYCRR § 301.7(a). This "catchall" provision is used only in "emergency or unusual situations" (Pl.Ex. 34, at 12), and DOCS officials cite to only one use of this provision since its promulgation in 1988. (*See id.;* Selsky Dep. at 75–76.)

### DISCUSSION

## A. LIBERTY INTEREST ANALYSIS

The struggle to define state prisoners' liberty interests began with the landmark decision *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) which revived the long-dormant Civil Rights Act of 1871 and created a federal remedy for the denial of constitutionally protected rights. Two non-prisoner cases in the early 1970s, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), "set the stage for a changed view of prisoners' right to due process in disciplinary proceedings and for a philosophical split within the [Supreme] Court as to the source of those rights—a split which is still evident in *Sandin.*" Deborah A. Stagner, Note, San-din v. Conner: *Redefining State Prisoners' Liberty Interest and Due Process Rights,* 74 N.C. L.Rev. 1761, 1767 (1996).

In *Goldberg,* the Court held that "[t]he extent to which procedural due process must be afforded . . . is influenced by the extent to which [an individual] may be 'condemned to suffer grievous loss.'" 397 U.S. at 262–63, 90 S.Ct. 1011. In *Roth,* the Court held that an individual is entitled to procedural protections when some source of positive law creates a "legitimate claim of entitlement." 408 U.S. at 577, 92 S.Ct. 2701.

In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Court extended *Goldberg* beyond property interests and applied the "grievous loss" test to determine whether due process was required in the liberty interest context before parole could be revoked. *See* 408 U.S. at 481, 92 S.Ct. 2593.

By the end of the 1970s, the entitlement theory set forth in *Roth* overtook *Goldberg*'s grievous loss analysis. In another landmark case, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court applied the "state-created right" concept to a prisoner's liberty interest in a claim seeking restoration of "good time" credits. In *Wolff,* the Court held that a prisoner's loss of state-created good time credits affected an interest of "real substance" and that a prisoner was entitled to minimum due process procedures to ensure that this liberty interest was not arbitrarily taken away. 418 U.S. at 557, 94 S.Ct. 2963.

"Much of *Wolff*'s contribution to the landscape of prisoners' due process derived not from its description of liberty interests, but rather from its intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due." *Sandin,* 515 U.S. at 478, 115 S.Ct. 2293 (1995). After *Wolff,* the Court considered several cases which "foreshadowed the methodology that would come to full fruition in *Hewitt v. Helms.*" *Id.* at 479, 103 S.Ct. 864 (cites omitted).

In *Hewitt,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court asked whether the state had gone beyond issuing mere procedural guidelines and had used "language of an unmistakably mandatory character" such that the incursion on liberty would not occur "absent specified substantive predicates." *Id.* at 471–72, 103 S.Ct. 864, *quoted in Sandin,* 515 U.S. at 480, 115 S.Ct. 2293. As pointed out by Justice Stevens' dissent in *Hewitt,* the Court's decision "attache[d] no significance either to the character of the conditions of confinement or to actual administrative practices in the institution." *Hewitt,* 459 U.S. at 482, 103 S.Ct. 864 (Stevens, J., dissenting). Justice Stevens maintained that "the relevant question in this case is whether transfer into administrative segregation constitutes a 'sufficiently grievous' change in a prisoner's status to require

the protection of 'due process.'" *Id.* at 484, 103 S.Ct. 864. As to what defines "sufficiently grievous," the dissent observed that "for a prisoner as for other persons, the grievousness of any claimed deprivation of liberty is, in part, a relative matter: one must compare the treatment of the particular prisoner with the customary, habitual treatment of the population of the prison as a whole." *Id.* at 486, 103 S.Ct. 864. Applying the majority's reasoning in *Hewitt,* however, led lower courts to find liberty interests to be created through the negative implication of mandatory language. *See Sandin,* 515 U.S. at 480, 115 S.Ct. 2293.

Ironically, Justice Stevens' dissent in *Hewitt* is precisely the new approach that the Supreme Court adopted in *Sandin* when criticizing the outcome of *Hewitt*'s methodology: "[N]o longer did inmates need to rely on a showing that they had suffered a 'grievous loss' of liberty retained even after sentenced to terms of imprisonment.... For the Court had ceased to examine the 'nature' of the interest with respect to interests allegedly created by the State." *Sandin,* 515 U.S. at 480, 115 S.Ct. 2293 (citations omitted).

In this way, the constitutional analysis of what constitutes a liberty interest has come full circle. The "grievous loss" analysis of *Goldberg,* although implicitly retained in the reasoning of *Wolff,* was abandoned for the mechanical explication of statutes and regulations in *Hewitt.* It now appears that the "grievous loss" test of *Goldberg* has been resurrected and repackaged as the "atypical and significant" hardship requirement in *Sandin:*

> Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause.... *But these interests will be generally limited to freedom from restraint which,* while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, *see, e.g., Vitek [v. Jones],* 445 U.S. [480,] 493 [, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)] (transfer to mental hospital), and *Washington [v. Harper],* 494 U.S. [210,] 221–22 [, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)] (involuntary administration of psychotropic drugs), *nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Sandin,* 515 U.S. at 483–84, 115 S.Ct. 2293 (citation omitted) (emphasis added).

The *Sandin* majority did not find a sentence of thirty days in segregation confinement in Hawaii's penal system to be "atypical" because the plaintiff's "confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293. The *Sandin* Court emphasized that Hawaii's prison regulations gave prison officials broad discretion to impose both disciplinary and nonpunitive segregation upon inmates. Moreover, the conditions of disciplinary segregation in Hawaii, "with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody," [12] and the State, in its administrative appellate process, expunged the plaintiff's disciplinary record. *Id.*

Although it might have intended to eliminate the allegedly mechanical hurdles created by *Hewitt,* the new approach required by *Sandin* simply has added a new, and complex, requirement to finding the creation of a liberty interest: a plaintiff must now show that the challenged confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. If a prisoner has been subjected to an "atypical and significant hardship," the court then inquires whether state law has created a liberty interest, in the same manner as before *Sandin. See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)

---

12. In Hawaii, "[w]ith the exception of one extra phone call and one extra visiting privilege, inmates segregated for administrative reasons receive the same privilege revocations as those segregated for disciplinary reasons." *Sandin,* 515 U.S. at 476 n. 2, 115 S.Ct. 2293.

("To prevail [in establishing a due process violation, a plaintiff] must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint.")

The defendants maintain that under *Sandin* no period of confinement in SHU is actionable for essentially two reasons. First, the defendants argue, New York State regulations do not create a liberty interest in remaining free from SHU, and instead the State retains the discretion to place inmates in SHU for any reason. Second, SHU confinement is an expected, ordinary and typical incident of prison life in New York State.[13]

Plaintiff instead maintains that because SHU confinement for periods over thirty days is so precisely regulated by the State, the State has created a liberty interest in remaining free of SHU confinement except in closely regulated situations. Moreover, according to plaintiff, New York State has made SHU confinements atypical and significant in relation to the ordinary incidents of prison life. Plaintiff contends that under New York State's disciplinary regime, due process protections should attach to every Tier III superintendent's hearing in the state, because the potential penalty for violations under Tier III includes SHU confinement without limitation and the loss of good time credit.

This Court in *Lee I* has already determined that the plaintiff was denied an assistant to aid him in his defense during his Tier III hearing in contravention of *Wolff* and state regulations. *See Lee I,* 902 F.Supp. at 433–34. Prior to *Sandin,* this Circuit long recognized that state statutes and regula-

tions limited the discretion of prison officials in placing inmates in restrictive confinement, SHU or administrative, thereby creating a liberty interest. *See Wright v. Smith,* 21 F.3d 496, 498 (2d Cir.1994) ("A liberty interest is created whenever state law identifies 'specified substantive predicates' for the imposition of administrative segregation."); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir. 1984) ("State statutes and regulations authorizing restrictive confinement as punishment upon a finding of a disciplinary infraction will invariably provide sufficient limitation on the discretion of prison officials to create a liberty interest.")[14]; *see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) ("Administrative confinement of a prison inmate is not restricted by the Fourteenth Amendment's Due Process Clause unless the state has created a liberty interest in remaining free from such confinement."). The issue that *Sandin* now creates is whether such confinement "imposes atypical and significant hardship on the inmates in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293.

### B. APPLYING THE *SANDIN* ANALYSIS

■ Many cases across the country have considered the impact of *Sandin* on prisoners' due process claims; however, this Court has the great benefit of a detailed factual record and the assistance of able counsel for both parties. This Circuit has already concluded that "*Sandin* did not create a per se blanket rule that disciplinary confinement may never implicate a liberty interest." *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997), and has required district courts to examine the "specific circumstances of the punishment." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir. 1997); *see also Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) ("[W]e have indicated the desirability of fact-finding before determin-

---

**13.** During oral argument, defense counsel contended that the duration of time spent in SHU is irrelevant: "I am saying duration in time spent in SHU should not be a factor because special— SHU time does not raise a liberty interest regardless of the amount of time, whether it be 30 days, 60 days, 100 days or 376 days." (Tr. at 39.)

**14.** *Sher* was decided under the state's old regulations governing restrictive confinement, which were revised in 1988. The events in the instant action occurred in 1992, four years after the revision. Regardless of any change in the regulations, the conditions remain the same that are at issue.

ing whether a prisoner has a liberty interest in remaining free from segregated confinement."); *Miller*, 111 F.3d at 9 ("[D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest."). This Circuit has made very clear, contrary to the position advocated by the defendants, that *Sandin* requires courts to examine both the duration of segregation and its conditions. *Wright v. Coughlin*, 132 F.3d 133, 136–37 (2d Cir.1998) (noting that under the analysis required by *Sandin*, district courts must consider whether the length of segregated confinement imposed is atypical and significant and whether the conditions of segregation differ in restrictiveness as compared to the prison at large and in administrative confinement); *Brooks*, 112 F.3d at 48–49 (same).

It is important to recognize that *Sandin* arose out of the Hawaii prison system, which has only one maximum security facility, Halawa Correctional Facility. *See* Petitioner's Brief at 12, *Sandin*, 515 U.S. 472, 115 S.Ct. 2293. In contrast, New York has fourteen maximum security facilities, including one solely SHU institution, Southport. In addition to the difference in the number of facilities, the regulations governing and the conditions within all the types of segregated confinement are markedly different.

Hawaii's prison regulations provide for five levels of discipline ranging from "greatest misconduct," Haw. Admin. Rule § 17–201–6 (1983), to "minor misconduct". *Id.* § 17–201–10.[15] The "greatest misconduct" category carries with it "[d]isciplinary segregation up to sixty days." *Id.* § 17–201–6(b)(1). Conner, the inmate plaintiff in *Sandin*, was charged with high misconduct, which sets available punishment for such an offense at disciplinary segregation up to thirty days or any sanction other than disciplinary segregation. *See* 515 U.S. at 475 n. 1, 115 S.Ct. 2293. The Hawaii system's "high misconduct" category is analogous in many respects to New York's Tier II disciplinary hearings, which

also limits discipline to thirty days of confinement and imposes restrictions, like Hawaii, on visitation and other privileges. Thus, unlike New York, Hawaii does not appear to have a disciplinary system that presents the potential of unlimited solitary segregation of an inmate. However, Hawaii Admin. Rule § 17–201–19(a)(2) permits the "adjustment committee" to impose a segregated confinement of more than sixty days with the "expressed written approval of the corrections division administrator, and the committee shall review the inmate's or ward's confinement at least once every thirty days." The *Sandin* opinion does not discuss how often, under what circumstances and for what duration this exception is invoked in Hawaii.

Significant differences also exist between the conditions of confinement in Hawaii's system as examined in *Sandin* and New York's system. Unlike Hawaii, where the general population in its one maximum security facility remains in lockdown from twelve to sixteen hours a day depending on the inmate's classification, *Sandin*, 515 U.S. at 486 n. 8, 115 S.Ct. 2293, the general population in Sing Sing, a maximum security prison, generally remain in their cell for only ten hours each day. (Pl.Ex. 16.) Second, unlike general population inmates, SHU inmates in New York are denied access to the wide variety of prison programs, and their access to personal belongings is severely restricted. (Pl.Ex. 22, at 4–5.) Conditions at Southport are even harsher than in SHU at other prison facilities in that prisoners are restrained when they leave their cells by handcuffs and for long periods also with waist chains; they also exercise alone, with restraints, and in "cages," as opposed to open spaces. (Morse Dep. at 32, 38.) In short, there is no congregate activity at Southport, while at least congregate exercise is available in SHUs elsewhere. Moreover, whereas general population inmates in New York have unlimited visits, inmates at Southport are limited to one visit per week, only on weekends and holidays, and only when space is available in

---

**15.** The other levels of discipline are: high misconduct, § 17–201–7; moderate misconduct, § 17–201–8; and low moderate misconduct, § 17–201–9.

the visiting room, which accommodates thirty-eight inmates at one time.

In *Sandin*, the Supreme Court focused on the broad discretion retained by the Hawaii prison system to place inmates in SHU for punitive and non-punitive reasons, and the many similarities between the conditions in general population, disciplinary segregation, administrative segregation and protective custody. *See Sandin*, 515 U.S. at 476 n. 2, 486, 115 S.Ct. 2293. However, these similarities between punitive and non-punitive special housing in terms of duration or conditions of confinement do not exist in New York State's prison system.

■ As noted, New York regulations limit the exercise of New York's discretion in placing prisoners in both punitive and non-punitive confinement. *See Wright v. Smith*, 21 F.3d 496, 499 (2d Cir.1994) (New York prison officials do not have the discretion to segregate inmates at will for more than brief periods of time and cannot do so unless one of the "substantive predicates,"—i.e., a threat to security, violation of a rule, need for protection—provided by regulations is present.); *Russell v. Coughlin*, 910 F.2d 75, 77 (2d Cir.1990) ("New York State's regulations governing keeplock create a liberty interest in remaining free from administrative confinement."); *Matiyn v. Henderson*, 841 F.2d 31, 35–36 (2d Cir.1988) (concluding that State of New York has created a protected liberty interest in inmates remaining free from involuntary protective custody). New York prison officials themselves recognize the limited nature of their discretion in that the "catchall" provision of New York regulations that permits placement in SHU "for any other reason" is used only in "emergency or unusual situations." (Pl.Ex. 34, Memorandum of Thomas A. Coughlin III, Commissioner, to Lawrence T. Kurlander, Director of Criminal Justice (the "Commissioner's Memo"), at 12.) Donald Selsky, the Director of Special Housing in DOCS, confirmed that this category is "rarely used," and he was aware of only one case in which it had been used since the promulgation of the provision

in 1988. (Selsky Dep. at 75–76; Pl.Ex. 34, the Commissioner's Memo, at 12.) Thus, directly contrary to the defendants' argument, New York neither in its regulations nor practice has retained or exercised unfettered discretion to place inmates in segregated confinement whether for punitive or non-punitive reasons.

Also contrary to the defendants' argument, inmates in special housing for non-punitive reasons are treated very differently than inmates who are segregated for punishment purposes. Administrative segregation inmates are always housed in SHU. (Selsky Dep. at 62.) Protective custody inmates may be housed in SHU or in areas within the general population. (*See id.* at 63.) Mr. Selsky testified that "our general goal is to limit the amount of inmates in protective custody and the length of time they spend in protective custody, if possible." (*Id.* at 66–67.) No data was submitted by the·defendants on the duration of such segregations. Nevertheless, as previously noted, administrative segregation in SHU is rare in New York State and is considered punitive, and only about fifty prisoners are kept in administrative segregation in the entire New York State prison system at any one time. (Selsky Dep. at 62.). The status of inmates who are placed in administrative segregation is reviewed by a three-person committee every seven days for the first two months, and every thirty days thereafter. *See* 7 NYCRR 301.4(d). The limited number, exigent circumstances, and frequent review of such segregations bespeak their atypicality.

DOCS also affirmatively discourages the use of SHU units for protective custody and works to move such prisoners from SHU units to protective custody facilities as quickly as possible. (Pl.Ex. 34, the Commissioner's Memo, at 10–11 ("Protective custody inmates are not generally placed in special housing units. Rather, they are housed in areas where only protective custody inmates commingle.... We make provisions in the proposed SHU rule for admission of protective custody inmates to account for situations where, due to enemies or other exigent cir-

cumstances, the inmate must be temporarily housed in SHU.").)

Unlike disciplinary or administratively segregated inmates in SHU, those inmates who are not being disciplined or administratively segregated, like protective custody inmates, are entitled to the same programs and privileges as general population inmates, though the services and programs are provided on the unit itself. Moreover, protective custody inmates have common areas to socialize, eat meals and watch television. (Kehn Dep. at 52–54; see 7 NYCRR § 330.4.) These inmates are not isolated like SHU inmates. Instead, "[t]here is more out-of-cell time for inmates in protective custody, more opportunity for congregate activities." (Selsky Dep. at 68.) Protective custody inmates may keep their personal property with them subject to safety and security limitations. See 7 NYCRR § 330.4(n). Thus, the conditions of non-punitive confinement in New York are substantially different than punitive confinement and do not, with minor exceptions, "mirror" each other as the Hawaii system examined in Sandin.

In short, unlike the conditions in Hawaii as examined in Sandin, New York's punitive segregation is punitive and imposes conditions of confinement significantly different inmate disciplinary programs. "I don't think when the series of penalties were designed, there was any hierarchy other than special housing assignment—that's the highest level of confinement." (Selsky Dep. at 79.) Moreover, Commissioner Coughlin wrote, "We don't want SHU to be a place where inmates go, get released and soon forget. For discipline to be meaningful, there must be both incentives and deterrents. In the process of setting statewide standards, we're retaining SHU's constitutional yet tough atmosphere." (Pl.Ex. 34, Commissioner's Memo, at 13.)

Many courts, as the defendants here argue, have concluded that Sandin stands for the proposition that solitary confinement as exemplified by SHU segregation cannot be an atypical and significant hardship of prison life because it is the type of discipline used "in response to a wide range of misconduct [which] falls within the expected parameters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485, 115 S.Ct. 2293. See Orellana v. Kyle, 65 F.3d 29, 31–32 (5th Cir.1995), cert. denied, 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("[I]t is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty.'"); Williams v. Ramos, 71 F.3d 1246, 1249 (7th Cir.1995) ("The essential facts of this case as Williams states them are virtually indistinguishable from Sandin."); Cespedes v. Coughlin, 956 F.Supp. 454, 470 (S.D.N.Y.1997) ("[T]he precedent established by these district courts unequivocally demonstrates their virtual refusal to find an atypical and significant hardship arising from a prisoner's confinement, even where the term of confinement is substantial." (citations omitted)); see also Frazier v. Coughlin, 81 F.3d at 317 (2d Cir.1996) (citing Sandin, 515 U.S. at 485, 115 S.Ct. 2293) (Plaintiff did not show that the conditions of his twelve-day confinement in SHU were "dramatically different" from the " 'basic conditions of [his] indeterminate sentence' " or outside " 'the expected parameters of the sentence imposed by a court of law.' ").[16]

However, these decisions never applied the rigorous factual analysis commanded by Sandin. Sandin clearly rejected the proposition that "solitary confinement automatically triggers due process protection" by labeling as dicta those portions of other Supreme Court cases like Wolff, 418 U.S. at 571 n. 19, 94

---

**16.** Frazier is troubling for the following reasons. First, the district court's decision was rendered before Sandin, and therefore the specific analysis required by Sandin was not considered by that court. Second, although the Circuit states that "[t]he extensive fact-finding of the district court permits us to measure Frazier's SHU claim by the standard of Sandin," Frazier, 81 F.3d at 317, the district court's factual findings (read into the record at the conclusion of a bench trial), concern Frazier's continued placement in the Closed Supervision Unit (CSU) at Shawangunk Correctional Facility, not in an SHU.

S.Ct. 2963 (Solitary confinement "represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct"), that had suggested such a conclusion. *Sandin,* 515 U.S. at 485, 115 S.Ct. 2293. *Sandin,* however, did not say that segregated confinement could never constitute an atypical and significant hardship. The Court instead explicitly held that the degree of restriction in segregated confinement and its duration had to be considered: "Conner's ... segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.... Conner's confinement did not exceed similar, but totally discretionary confinement *in either duration or degree of restriction.*" *Id.* at 486, 115 S.Ct. 2293 (emphasis added).

*Sandin* compared the expectations of prisoners in administrative segregation and protective custody with those in disciplinary segregation because the Court concluded that in Hawaii the conditions imposed upon inmates in all three segregations, "with insignificant exceptions, mirrored" each other. *Id.* Moreover, the Court compared the significant lock-down time of Hawaii's general population with the segregated confinement of SHU: "Based on a comparison between inmates inside and outside disciplinary segregation [in Hawaii], the State's actions in placing [Conner] there for 30 days did not work a major disruption in his environment." *Id.* In New York, however, the conditions of protective custody more closely mirror those in general population, and administrative confinement, limitedly used and when used, subject to frequent review, is closely cabined by extensive state restrictions. Accordingly, "the relevant comparison for *Sandin* purposes in New York [should be] between inmates in the SHU for disciplinary purposes and inmates in the general population." *Justice,* 941 F.Supp. at 1324. In New York, unlike Hawaii, the full isolation of punitive confinement, compounded by the duration and the loss of all privileges of long-term punitive confinement, do impose a "major disruption" in an inmate's environment. This is particularly true under the instant circumstances, where plaintiff was sentenced to SHU confinement that was longer in duration than 99% of the general inmate population who are ever sentenced to SHU. (Boston Decl. ¶¶ 7–10.) [17]

Plaintiff has advocated and at least one district judge and one magistrate judge in this Circuit have concluded that a liberty interest in New York is attached to every Tier III hearing because the maximum sentences permitted in Tier III hearings imposes the potential of atypical and significant hardship. *See Justice,* 941 F.Supp. 1312; *see also Dawes v. Dibiase,* 1997 WL 376043 (N.D.N.Y. July 3, 1997). *Sandin,* however, examined the punishment actually imposed upon the plaintiff and not the potential punishment. After the briefing for the instant motion, the Second Circuit in *Scott v. Albury,* 138 F.3d 474 (2d Cir.1998), rejected the potential penalty approach and held that in conducting a *Sandin* analysis of atypicality and significance, "courts should consider the degree and duration of the sentence actually imposed in the hearing and not the maximum sentence that might have been imposed." *Id.* at 479, 115 S.Ct. 2293.

Having examined the disciplinary regime of the New York State prison system, and having compared the day-to-day life of plaintiff in general population to his day-to-day life in SHU at Southport, the Court finds that the plaintiff's 376 days in SHU—362 of those days confined in SHU in Southport—qualifies as an atypical and significant hardship in relation to the ordinary incidents of

---

**17.** The *Sandin* Court also compared the length of that plaintiff's sentence in disciplinary segregation, which was just 30 days, to the length of his overall prison term, which was 30 years to life. The Court found that, based on this ratio, the duration of time in disciplinary segregation was "within the range of confinement to be normally expected." *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293. Plaintiff Lee served much longer in disciplinary segregation than Conner—376 days—and has a shorter overall prison sentence—25 years to life. (Pl.Ex. 9.)

prison life in New York in terms of both duration and degree of restrictedness.

As noted, some courts have concluded, as argued by the defendants, that near isolation and the complete loss of programs and privileges do not constitute atypical and significant hardships in prison because no liberty interests exists in any particular program or in any particular regime within prison. These courts, however, overlook the basic premise of *Sandin:* states can create liberty interests when they create explicit procedural protections before imposing segregation and impose hardships in segregated punishment that are atypical of the ordinary incidents of prison life. In New York, like many states, year-long sentences in punitive segregation in virtual isolation conditions, even while exercising, with limited visits and virtually no personal belongings, present a dramatic departure from ordinary prison life. Prison management would be made more difficult if prisoners were subjected to these harsh conditions routinely and without process. Defendants' counsel opined that if inmates facing long sentences in SHU were not afforded notice and the opportunity to be heard, punitive segregation would lose its impact as an effective management tool:

> I think that the New York State system has Tier 3[III] hearings, you know, for one thing to give the inmates a way of explaining their actions or to defend themselves similar that they would have in a court of law. *To have an inmate and just put him in special housing unit because he doesn't have a per se liberty interest would cause such an unrest within the prison system that it would be unlivable and would not be able to function as a prison.*
>
> If you just across the board said because there is no liberty interest in being in SHU or special housing unit, punitive segregation, we are going to put you in punitive segregation because we think that you assaulted this inmate. It is a way to make sure that innocent people are not going, spending significant time in punitive segregation....

> *You can't run a prison like that. It would be impossible from an inmate's point of view to not have these kind of Tier 3[III] hearings.*

(Tr. at 17–18)

In fact, in response to the argument of some district courts that it was unworkable to identify the creation of a liberty interest on actual punishment because States could not determine in advance of sentence the procedural requirements necessary in a particular case, the Second Circuit in *Scott* "assume[d] that states will take the precaution of providing the required level of due process to every inmate who realistically faces a punishment that is atypical under *Sandin,* a precaution that would render the actual punishment rule perfectly workable." *Scott,* 138 F.3d at 478.

The Supreme Court in *Wolff* had no difficulty in recognizing the significant hardships of isolation. *See Wolff,* 418 U.S. at 571, n. 19, 94 S.Ct. 2963 (Solitary confinement "represents a major change in the conditions of confinement."). The dissent in *Hewitt,* written by Justice Stevens, the advocate of the grievous loss approach of *Goldberg,* also concluded that the conditions of solitary confinement, similar to the conditions now in New York, were a "drastic" and "severe" impairment of the inmate's life in prison and triggered the protection of the due process clause of the Constitution. *Hewitt,* 459 U.S. at 487–88, 103 S.Ct. 864. The *Sandin* majority, however, did not perceive the conditions of segregation in Hawaii for thirty days to impose an atypical or significant hardship. *See Sandin,* 515 U.S. at 494, 115 S.Ct. 2293 (Breyer, J., dissenting) ("The punishment [SHU] worked a ... major change in Conner's conditions.... Conner, for 30 days, had to spend his entire time alone in his cell (with the exception of 50 minutes each day on average for brief exercise and shower periods, during which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains)."). As noted, however, *Sandin* dealt with an isolation limited to thirty days, and the Supreme Court's analysis gave equal weight to both the relatively short duration of the confinement and the similarity of its conditions

to non-punitive segregated confinements in Hawaii. As also noted, the Second Circuit recently in *Wright* and *Brooks* underscored the importance of considering the duration of confinement to the *Sandin* analysis.

The effect of prolonged isolation on inmates has been repeatedly confirmed in medical and scientific studies. Dr. Stuart Grassian, a board certified psychiatrist, researcher and teacher, has submitted an affidavit that chronicles the extensive literature, studies and observations of the psychological effects on inmates of prolonged solitary confinement.[18] Dr. Grassian explains:

> The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, producing a stuporous condition associated with perceptual and cognitive impairment and affective disturbances. In more severe cases, inmates so confined have developed florid delirium—a confusional psychoses with intense agitation, fearfulness, and disorganization. But even those inmates who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement, especially when the confinement is prolonged . . . .

(Grassian Aff. ¶ 82.)

The focus in *Sandin* between punitive and non-punitive segregation of thirty days should not obscure the basic reality that lengthy disciplinary sentences in SHU in New York for periods of a year and more, are intended to be, and are, severe, harsh and atypical. This plaintiff, who was placed in the most punitive of the system's facilities, an institution into which protective custody and administrative segregation inmates are not transferred, served the harshest of the state's confinements for a duration far exceeding the time spent in SHU by the vast majority of all inmates segregated for any

reason. Under these circumstances, this confinement of 376 days was atypical and significant, and New York can be found to have created a liberty interest, as Sandin has defined that term.

## C. QUALIFIED IMMUNITY BASED ON SANDIN

In *Lee I*, the Court rejected the defendants' qualified immunity defense on the ground that defendants violated a then clearly established right of plaintiff to have an assistant aid him during his disciplinary hearing, that defendants knew of this right, and that it was not objectively reasonable for them to believe their actions did not violate the plaintiff's rights. *See Lee I*, 902 F.Supp. at 435. In their current motion for reconsideration, the defendants maintain that *Sandin* demonstrates that plaintiff's right to remain free from disciplinary confinement was not clear at the time of their actions. I disagree.

Qualified immunity protects a defendant based on the objective reasonableness of his own actions in light of his knowledge of the facts at the time he acted. Hindsight is not the appropriate test. The extent of the protection afforded defendants depends upon the " 'objective legal reasonableness' " of the defendants' actions "assessed in light of the legal rules that were 'clearly established' at the time [they were] taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396).

The defendants' violations of the plaintiff's rights occurred in the summer of 1992. At that time and until the decision in *Sandin* in 1995, "in the Second Circuit the law was clear that an inmate had a protected liberty interest in remaining free from segregated confinement" and "that [such] confinement impaired a liberty interest protected by

---

18. In *Jolly v. Coughlin*, 894 F.Supp. 734, 738 (S.D.N.Y.1995), aff'd, 76 F.3d 468 (2d Cir.1996), the plaintiff inmate had been kept in medical keeplock, a form of solitary confinement, for over four years for his refusal to submit to a tuberculosis screening test on religious grounds. The inmate claimed that as a result of his prolonged confinement, he could not stand up to shower and he developed rashes, severe headaches, shortness of breath and hair loss. *See id.* at 738.

state law." *Dawes*, 1997 WL 376043, at *8 (citing *McCann v. Coughlin*, 698 F.2d 112, 121 (2d Cir.1983); *Sher*, 739 F.2d at 81; *Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir.1988)). In light of the law as it existed when the defendants acted here, the unlawfulness of their actions should have been clear to them. Whatever change in the law *Sandin* occasioned in 1995, the process to which the plaintiff was entitled and defendants' failure to provide it violated a liberty interest that was clearly established in 1992. Having found in *Lee I* that it was not objectively reasonable for defendants to believe their actions were constitutional at the time, I reject the defendants' claim that they are now entitled to qualified immunity because of a change in the view of law after *Sandin*. *See Carlo v. Chino*, 105 F.3d 493, 501 n. 2 (9th Cir.1997) ("Although *Sandin* has articulated a new test, at least for convicted prisoners, for determining when a state statute creates an interest protected by the Fourteenth Amendment, *Sandin* did not address the questions of qualified immunity. Qualified immunity asks what law was clearly established at the time the alleged violation occurred. In 1991, the *Helms* test was the clearly established law."); *Bruns v. Halford*, 913 F.Supp. 1295, 1305 (N.D.Iowa 1996) ("Because the Sandin decision was handed down after the conduct complained of here occurred, it cannot, of course, establish qualified immunity in this case, because it was not pre-existing law."); *Dawes*, 1997 WL 376043, at *8 (The issue for application of a defense of qualified immunity is whether "the law as to the confinement of a prisoner in SHU for disciplinary reasons was clearly established during the time frame in which the events relating to this action arose.").

## CONCLUSION

The Court had previously granted plaintiff's cross-motion for summary judgment, finding that defendant Mahoney had deprived plaintiff of his right to an employee assistant to prepare for his Tier III Superintendent's hearing in violation of plaintiff's due process rights. Upon reconsideration, the plaintiff has established that his 376–day sentence in SHU was an atypical and significant hardship in relation to the ordinary incidents of his prison life and, therefore, the Court denies the defendants' renewed motion for summary judgment and affirms its grant of the plaintiff's cross-motion for summary judgment.

The Court has also denied defendant Mahoney's defense of qualified immunity, rendering the Court's decision on this issue immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Behrens v. Pelletier*, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). The *Sandin* question as decided by this opinion and order, however, involves a novel and alternatively dispositive analysis that is interwoven with the defendants' qualified immunity defense. Therefore, the Court believes an interlocutory appeal of both the qualified immunity defense and the grant of summary judgment are appropriate. Pursuant to 28 U.S.C. § 1292(b), I find that the grant of plaintiff's cross-motion for summary judgment on liability involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from the order may materially advance the ultimate termination of this litigation. Accordingly, the Court stays this action, including entry of judgment, pending any interlocutory appeal. Should no appeal be taken or should the Second Circuit deny interlocutory appeal of the grant of summary judgment, the parties should contact the Court immediately to schedule a conference and inquest on damages.

**SO ORDERED.**