Julio GIANO, 85–A–3468, Plaintiff,

v.

Donald SELSKY, Director of S.H.U.; Thomas A. Coughlin, III, Commissioner; Daniel Senkowski, Superintendent; William Costello, Deputy of Security; Joseph Wood, Correctional Captain; David Armitage, Correctional Sergeant, Defendants.

No. 91–CV–166 LEK/DNH.

United States District Court,
N.D. New York.

Feb. 16, 1999.

---

Julio Giano, Comstock, NY, Pro Se.

Eliot Spitzer, Attorney General of State of New York, Albany, NY, for Defendants; John J. Dowd, Assistant Attorney General, of Counsel.

*Memorandum–Decision and Order*

KAHN, District Judge.

## I. Introduction

Plaintiff *pro se,* Julio Giano ("Plaintiff" or "Giano"), brings this action pursuant to 42 U.S.C. § 1983 (1994) alleging that Defendants violated his right to due process by wrongfully placing him in administrative segregation while he was an inmate at Clinton Correctional Facility ("Clinton"), a maximum security prison in the New York State Correctional Services system. Specifically, Plaintiff avers that the initial decision to place him in administrative segregation and subsequent decisions to continue his placement therein were made under false pretenses. Presently before this Court are Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment.

## II. Background

Plaintiff first entered the New York State corrections system in August, 1985. Prior to this date, Plaintiff attempted to escape from the Nassau County courthouse. During the attempted escape, several court officers were severely injured. Plaintiff first entered Clinton sometime after August, 1985, but on July 28, 1986, Plaintiff was transferred from Clinton to Sing Sing Correctional Facility ("Sing Sing") in Ossining, New York. On December 9, 1986 Plaintiff and two other inmates escaped from Sing Sing. Plaintiff was captured soon thereafter and sentenced to five (5) years in the Special Housing Unit ("SHU")[1] at Sing Sing. On December 23, 1987, after spending approximately one year in the SHU at Sing Sing, Plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk") in Wallkill, New York. Plaintiff spent approximately one more year in Shawangunk's SHU and

was then released to the general prison population based on his good behavior.

On September 12, 1988, an unknown inmate stabbed Plaintiff in the back resulting in a serious injury to Plaintiff's right shoulder. Because of the incident and Plaintiff's refusal to voluntarily enter protective custody, Plaintiff was placed in Shawangunk's involuntary protective custody ("IPC") unit. Plaintiff spent twenty-nine (29) days in IPC and was then transferred to Attica Correctional Facility ("Attica") on October 10, 1988. Upon his arrival at Attica, Plaintiff was placed in administrative segregation because (1) he had been stabbed by an unknown inmate and (2) his escape record. On August 10, 1990,[2] after six-hundred-and-seventy (670) days in administrative segregation at Attica, Plaintiff was transferred back to Clinton.

Upon his return to Clinton, Plaintiff was mistakenly placed in Protective Custody. When the mistake was discovered, Plaintiff was again placed in administrative segregation. On August 13, 1990, Defendant David Armitage "Armitage"), a sergeant in the New York Department of Correctional Services ("DOCS"), made the following recommendation:

> Due to the administration's concern regarding Inmate Giano's transfer to Clinton from Attica Correctional Facility, where he was in administrative segregation status, it has been requested that that status be retained at this facility. Inmate Giano is serving time for six (6) felonies, the longest term involving 25 to Life for Murder 2 and the most recent Escape 1, concerning an escape on 12/9/86, from Sing Sing Correctional Facility. Due to this information, Escape from a Max A Facility, it is requested that Giano be placed in Administrative Segregation as he presents a possible

---

**1.** Special Housing Units are "single occupancy cells grouped so as to provide separation from the general population." N.Y. Comp. Codes R. & Regs., tit. 7, § 300.2(b)

**2.** The parties do not agree as to the exact date Plaintiff was transferred to Clinton. For purposes of the present motion, however, the difference between the parties' respective contentions is not relevant.

threat to the safety and security of the facility.

Defs.' Mem. Summ. J., Ex. N. This review was followed by an Administrative Segregation Admission hearing on August 17, 1990. At the conclusion of the hearing, the hearing officer, Defendant Joseph Wood ("Wood"), upheld Armitage's recommendation to place Plaintiff in administrative segregation based on the following:

(1) the recommendation written by Sergeant Armitage where it stated that inmate Giano escaped from a maximum security facility on December 9, 1986;

(2) Plaintiff's verbal testimony confirming the fact that he escaped from Sing Sing on December 9, 1986;

(3) Sergeant Armitage's verbal testimony concerning his review of plaintiff's records which confirmed that Giano was successful in an organized escape from Sing Sing and was also involved in a near successful escape from custody (Nassau County courthouse) which involved serious injury to others;

(4) Giano's familiarity with the Clinton Correctional Facility.

Defs.' Mem. Summ J., Statement of Material Facts at ¶ 16; see also id., Ex. A. at 59. On September 11, 1990, Defendant Donald Selsky ("Selsky"), Director of Special Housing/Inmate Disciplinary Program, affirmed Defendant Wood's findings. On October 22, 1990, Plaintiff claims his counselor told him that Defendant Daniel Senkowski ("Senkowski") would release him from administrative segregation only if Giano signed a form consenting to being admitted into protective custody. Plaintiff claims he refused the offer because Senkowski would not put it into writing. On October 24, however, Plaintiff accepted Senkowski's offer because he felt his living "conditions would be much better" in Protective Custody rather than in administrative segregation. Approximately one week later, Plaintiff contends that Defendant William Costello ("Costello") and another individual met with him and told him he

would be released from administrative segregation if he signed a waiver releasing Clinton from potential liability for any harm that Plaintiff might incur upon his return to the general population.

Plaintiff signed the waiver but was not then released into the general population. Instead, on November 5, 1990, Plaintiff was placed in the Protective Custody unit. On November 6, 1990, Defendant Armitage asked Plaintiff to sign a second waiver similar to the first so that he could be released to the general population. Plaintiff signed the form, but was then told by Defendant Armitage approximately one hour later that he would not be released to the general population until he signed a consent to protective custody. Plaintiff refused to sign the consent and was thereafter taken back to administrative segregation. On November 8, 1990, Plaintiff contends that Defendants Senkowski, Costello, and McCormick came to his cell and told him that he would remain in administrative segregation until he consented to protective custody. Plaintiff claims that he eventually signed the consent form because he feared spending the remainder of his sentence in administrative segregation.

On November 9, 1990, Plaintiff was admitted into Clinton's Protective Custody unit. The reason given for Plaintiff's placement was that Plaintiff's "records indicate [he was] stabbed by an unknown inmate at another New York Correctional Facility. It is not known if that inmate is at this facility. For your own safety it is recommended you be placed on Protective custody status." Def.'s Mem. Summ. J. Ex. U. Plaintiff's status in Protective Custody was reviewed periodically and it was determined that his continued placement therein was warranted because the circumstances justifying his initial placement had not changed. Giano remained in Protective Custody until December 13, 1990. Between administrative segregation and protective custody, Plaintiff spent one-hun-

dred and twenty-five (125) days in SHU.[3]

Giano alleges that his "due process right to a fair hearing before he was admitted to segregation was violated in that the hearing was nothing more than a pretext." Pl.'s Pretrial Mem. at 2, Dkt. #69. He further contends that his "due process right to meaningful review of his continued confinement in segregation was violated in that the reviews were not done in a meaningful time and in a meaningful manner." *Id.* Defendants seek summary judgment on the following six (6) grounds: (1) Giano has failed to show that his period of confinement imposed an atypical and significant hardship; (2) the procedures Defendants followed afforded Giano all the process he was due; (3) Defendants have qualified immunity; (4) the evidence was sufficient to sustain the decision to place and maintain Giano in segregated confinement; (5) Giano is precluded from bringing this action because, if he is successful, such a holding would undermine the validity of the underlying conviction; and (6) a § 1983 action cannot be maintained against Defendant Coughlin because he was not personally involved in the actions or decisions giving rise to this lawsuit.

The Court limits its discussion to Defendants' first contention as it is dispositive here.

### III. Discussion

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2nd Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2nd Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2nd Cir.1983). A genuine issue is an issue that, if resolved in favor of the non-moving party, would permit a jury to return a verdict for that party. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2nd Cir.1997) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

When the moving party has met its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–249, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. Thus, summary judgment is proper where there is "little or no evidence ... in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–1224 (2nd Cir. 1994) (citations omitted). This Court examines the circumstances presented here with the foregoing in mind.

---

**3.** According to Giano, that 125 days breaks down as follows: 92 days in administrative segregation (August 10, 1990 to November 9, 1990) and 33 days in Protective Custody (November 10, 1990 to December 13, 1990). *See* Dkt #48. Defendants, on the other hand, claim Plaintiff spent only 86 days in administrative segregation and the remaining 39 days in Protective Custody. *See* Defs.' Affirmation in Opp'n Pl.'s Cross–Mot. Summ. J., Ex. 1

■ The Due Process Clause of the Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. Though countervailing considerations of security, discipline, and order alter the jurisprudence somewhat in the context of prisoners' rights, *see, e.g., Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Id.* Accordingly, to present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process. *See Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2nd Cir.1996).

■ Liberty interests warranting due process protection stem from either the due process clause acting on its own force or state statutes and regulations. *See Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The former, however, protects only against restraints that "exceed[ ] [the plaintiff's] sentence in ... an unexpected manner." *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Accordingly, the Supreme Court has invoked the protection of the due process clause as such only in extreme circumstances. *See Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (finding liberty interest in prisoner's right to refuse involuntary administration of psychotropic drugs); *Vitek v. Jones*, 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) ("[I]nvoluntary confinement to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual"). The more common inquiry, therefore, is whether state law has afforded the prisoner a liberty interest.

■ Until recently, courts looked for language of an " 'unmistakable mandatory character' ", *Sandin*, 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (quoting *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), to determine whether the relevant state statute or regulation gave rise to a liberty interest "such that incursion on [that interest] would not occur 'absent specified substantive predicates' ". *Id.* In *Sandin*, however, the Court found that the *Hewitt* regime

produced at least two undesirable effects. First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment.

. . .

Second, the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone. In so doing, it has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.

*Sandin*, 515 U.S. at 482, 115 S.Ct. 2293. As a result, the Court shifted the focus from the language of the relevant state law to "the nature of the deprivation." *Id.* at 481, 115 S.Ct. 2293. After *Sandin*, the critical inquiry for courts is whether the restraint at issue "impose[d] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293. In shifting the focus, however, *Sandin* has given rise to an inconsistent body of case law as to what circumstances give rise to an "atypical and significant hardship."

Recent pronouncements of the Second Circuit and lower courts within this Circuit, however, have given some clarity to these muddy waters. First, it is now settled that the "atypical and significant hardship" inquiry is factintensive. *See, e.g., Wright v. Coughlin*, 132 F.3d 133 (2nd Cir.1998) (district court must make factual findings as to whether 288 day segregative confinement implicates a liberty interest);

*Miller v. Selsky,* 111 F.3d 7, 9 (2nd Cir. 1997) ("[D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest."); *Sealey v. Giltner,* 116 F.3d 47, 52 (2nd Cir.1997); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2nd Cir.1997) (stating that question of whether confinement is atypical and substantial requires "careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions"). Second, in reviewing the nature of the confinement, courts must look to the actual sentence imposed and not the potential sentence. *Scott v. Albury,* 138 F.3d 474 (2nd Cir. 1998). Third, the *Sandin* analysis applies whether plaintiff challenges a disciplinary or an administrative restraint. *Arce v. Walker,* 139 F.3d 329, 335 (2nd Cir.1998) ("Nothing in *Sandin* . . . indicates that the new standard it articulated . . . was to be limited to prisoner challenges against disciplinary restraints."). Fourth, courts have recognized that *Sandin* requires examination of both the duration and the conditions of confinement. *See Brooks v. DiFasi,* 112 F.3d 46, 49 (2nd Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255 (N.D.N.Y.1998). Finally, though not a consensus view, the trend among courts is that the conditions of confinement should be compared to the conditions manifest in the general population of the prison and in other segregative housing. *See Sandin,*

515 U.S. at 486, 115 S.Ct. 2293 (comparing conditions of disciplinary housing to those of administrative segregation and protective custody); *Justice v. Coughlin,* 941 F.Supp. 1312, 1324 (N.D.N.Y.1996) ("[T]he relevant comparison for *Sandin* purposes . . . is between inmates in [solitary confinement] and inmates in the general population.").

Thus, in sum, a district court applying *Sandin* must engage in a fact-intensive inquiry to determine whether the duration of plaintiff's actual period of administrative or disciplinary confinement and the conditions thereof are so different from conditions manifest in both the general population of the prison and other segregative housing as to give rise to a liberty interest.

█ Courts in this Circuit have not delineated a specific length of confinement that necessarily gives rise to a liberty interest. Courts have, however, recognized the fact that brief periods of confinement (less than thirty days) do not impose an "atypical and significant hardship." *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2nd Cir.1996) (12 days insufficient under *Sandin* ); *see gen., Williams v. Kane,* No. 95–CV–0379, 1997 WL 527677, at *6 (S.D.N.Y. August 25, 1997) (citing cases). Indeed, though unanimity appears untenable, several courts have suggested that a period of confinement less than 365 days does not give rise to a liberty interest.[1] The better

1. *Cespedes v. Coughlin,* 956 F.Supp. 454, 470–71 (S.D.N.Y.1997) ("the precedent established by these district courts unequivocally demonstrates their virtual refusal to find an atypical and significant hardship arising from a prisoner's confinement, even where the term of confinement is substantial.") (citing cases); *accord, e.g., Williams v. Kane,* 1997 WL 527677, at *8; *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *5 (S.D.N.Y. March 24, 1997) (Peck, M.J.). In fact, one court found that "courts in this and other districts have subsequently [to *Sandin* ] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of *Sandin* .... [I]t now appears that any period of segregation of one year or less affords no protected liberty interest." *Accord, e.g., Tellier v. Scott,*

94 Civ. 3459, 1998 WL 65983, at *4 n. 12 (S.D.N.Y.Feb.18, 1998) (noting that "[a] number of district courts have dismissed claims where the duration of segregated confinement was one year or less"); *Dawes v. Dibiase,* No. 91–CV–479, 1997 WL 376043, at *5–6 (N.D.N.Y. July 3, 1997) ("A review of numerous post-*Sandin* decisions throughout the Second Circuit reveals a trend illustrating the proposition that confinement in SHU of up to one year does not implicate a liberty interest under *Sandin* .... In light of the above referenced body of post-*Sandin* caselaw, this Court will not hold that confinement in SHU of six, twelve and two months, respectively, imposes an 'atypical and significant hardship' on plaintiff.") (citing cases); *Marino v. Klages,* 973 F.Supp. 275, 278 (N.D.N.Y.1997) ("district courts in the Second Circuit have gener-

view, however, is that the duration of confinement is a consideration in the analysis in addition to the conditions thereof. For instance, in *Vasquez v. Coughlin,* 2 F.Supp.2d 255 (N.D.N.Y.1998), Chief Judge McAvoy rejected the trend toward bright-line categorizations and stated the following:

> [I]t is insufficient in this Circuit for a court to simply rely on the length of confinement as the determinative factor.... [I]n order for this Court to determine whether Plaintiff has a liberty interest in avoiding SHU confinement, it is necessary for the Court to examine the specific circumstances of his confinement.

*Id.* at 259. *See also Brooks v. DiFasi,* 112 F.3d at 49 ("A court must examine the specific circumstances of the punishment."). Consequently, this Court examines the conditions and duration of Plaintiff's confinement.

There are fifteen (15) maximum security facilities in the New York State Department of Correctional Services. Each of these facilities has Special Housing Units ("SHU") which are "single occupancy cells grouped so as to provide separation from the general population." N.Y. COMP. CODES R. & REGS. ("NYCRR") tit. 7, § 300.2(b); *see also* Defs.' Statement of Facts, Ex. Y (Annuccci Aff. at ¶ 10). An inmate may be placed in a SHU: (1) for disciplinary purposes, *see* NYCRR tit. 7, § 301.2; (2) as part of administrative segregation, *see id.* at §§ 301.3, 301.4; (3) to protect the inmate, *see id.* at § 301.5; (4) as part of keeplock admission, *see id.* at § 301.6; or (5) "for any reason".[2] *see id.* at § 301.7.

Pertinent to the case sub judice is the fact that inmates are subject to administrative segregation when the facility determines that the "inmate's presence in general population would pose a threat to the safety and security of the facility." *Id.,* § 301.4(b) (1998). The NYCRR specifies that inmates in administrative segregation are subject to the same rules and regulations as those placed in segregated housing for disciplinary reasons once the disciplined inmates have passed a thirty (30) day test period. *Id.,* § 301.4(c); *see also Wright v. Coughlin,* 31 F.Supp.2d 301, 322 (W.D.N.Y.1998)(citing cases that found conditions of administrative segregation mirror those in disciplinary SHU). Administrative segregation entails a number of restrictions on an inmate's privileges relative to his status in the general population. Specifically, administrative segregation inmates are entitled to one nonlegal visit per week (legal visits are not restricted). *Id.* at § 302.2(j)(1)(i). Telephone calls are not permitted unless required for an emergency or a legal reason. No SHU inmates may receive packages except for books, periodicals, and legal materials. *See id.* at § 302.2(j)(3). SHU inmates may make purchases totaling only fifty percent (50%) of the "monthly total permitted general population inmates". *Id.* at § 303.3. Perhaps the greatest difference between administrative segregation inmates and those in the general population is the fact that administrative segregation inmates are permitted out of their cells for only one (1) hour per day consisting of outdoor exercise. *See id.* at § 304.3. The exercise period is subject to restrictions due to weather, *id.* at §§ 303.3(a), (c), or safety

---

ally found that any SHU confinement under a year in time is not an atypical or significant hardship on the prisoner."); *Polanco v. Allan,* No. 93–CV–1498, 1996 WL 250237, at *3 (N.D.N.Y. May 6, 1996) (365 days in SHU upheld), reaff'd on reconsideration, 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996) ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in

SHU was not "outside the parameters of plaintiff's sentence").

**2.** It should be noted that in other litigation, prison officials have stated that this "catch-all" provision is rarely if ever used. *See Lee v. Coughlin,* 26 F.Supp.2d 615, 629 (S.D.N.Y. 1998) ("DOCS officials cite to only one use of this provision since its promulgation in 1988.").

concerns. *See id.* at § 303.3(d). Further, administrative segregation inmates are entitled to only two (2) legal items from the law library at a time and do not have access to the general library. Moreover, because of the more punitive character of administrative segregation, an inmate therein is entitled to a hearing within fourteen (14) days of admission, *see* NYCRR tit. 7, § 301.4(c), and a three-member committee reviews the inmate's status once every seven (7) days for the first two (2) months and then once every thirty (30) days thereafter. *Id.* at § 301.4(d).

Though both parties agree that the total time Plaintiff spent in both administrative segregation and protective custody at Clinton was one-hundred-and-twenty-five (125) days, they dispute the number of days Plaintiff spent in administrative segregation. *See supra* note 3. Plaintiff claims that the time he spent in protective custody should be considered in the analysis because the conditions of protective custody are similar to the conditions of administrative segregation. Moreover, Plaintiff claims that the Court should consider the total time he spent in SHU while he was an inmate at Shawangunk (29 days after the stabbing incident), Attica (670 days administrative segregation), and Clinton (125 days administrative segregation and protective custody) for a total of 824 days. Accordingly, the Court is called upon to address two issues: (1) whether the time Giano spent in protective custody should be considered in addition to the time he spent in administrative segregation at Clinton; and, (2) whether the time Giano spent in SHU confinement prior to his arrival at Clinton should be considered. These issues are discussed seriatim.

 The time Plaintiff spent in protective custody at Clinton, whether voluntary or involuntary, is not considered here because the conditions of protective custody more closely resemble those of the general population rather than those of disciplinary confinement. While Plaintiff claims his placement in protective custody was involuntary rather than voluntary, the distinction is without difference for purposes of this discussion. Voluntary and involuntary protective custody both concern individuals who are "potential victim(s) or . . . witness[es] likely to be intimidated, or who lack[ ] the ability to live in the general facility community and who may for good cause be restricted from communication with the general inmate population . . . ." NYCRR tit. 7, § 330.2(a), (b). The two forms of protective custody differ only with respect to status review procedures. An inmate in voluntary protective custody can request reassignment to the general population. Such a request must either be granted or be followed by a hearing no more than fourteen (14) days after the request is made. *Id.* at § 330.3(a). There is no provision in the regulations granting an inmate in involuntary protective custody the right to request reassignment. Instead, such inmates are dependent upon the outcome of hearings held once every thirty (30) days, the purpose of which is to reexamine the inmate's status. *Id.* a § 330.3(b).

Though there are no substantive differences between voluntary protective custody and involuntary protective custody, there is a difference between protective custody and administrative segregation. For example, protective custody inmates are permitted to: spend three (3) hours out of their cells per day, *id.* § 330.4(a);[3] eat two meals per day out of their cells, *id.* § 330.4(c)(1); participate in the general library services, *id.* at § 330.4(f); receive packages, *id.* § 330.4(h); participate in the telephone-home program, *id.* at § 330.4(i); retain their visitation rights without restriction unless imposed for disciplinary reasons, *id.* at § 330.4(k); and retain their personal property provided same does not

---

**3.** Since Giano was housed at Clinton, however, the additional two hours out-of-cell time and two meals per day out of cell time were

not permitted due limitations in the physical configuration of the unit in which protective custody inmates are housed. *Id.* at § 330.5.

create a concern for safety or security. *Id.* at § 330.4(n).

In fact Plaintiff concedes there are difference between the two forms of confinement.[4] For example, Plaintiff stated that inmates in PC/IPC, unlike those confined in administrative segregation, are not stripped of their personal property and privileges. They are allowed to possess all their personal property, and retain their package, commissary and telephone privileges. They may also participate in the family reunion program and allowed to receive daily visits. Pl.'s Statement Material Facts at ¶ 57; *see also id.* at ¶¶ 65, 66. Plaintiff's argument is that these considerations contribute to the marked difference between general population inmates and administrative segregation inmates. He does not, however, explain why these same considerations are insignificant when comparing administrative segregation to protective custody inmates. Moreover, Plaintiff acknowledges that he consented to placement in protective custody because "his living 'conditions would be much better' than that which he was being subject to in administrative segregation." *Id.* at ¶ 11.

Simply stated, there are sufficient differences between protective custody and administrative segregation so as to not consider them as equal components in one continuous period of confinement.

■ In addition, this Court does not consider the time Plaintiff spent in protective custody or administrative segregation at Shawangunk and Attica, respectively, in

its analysis. Because Plaintiff was placed in involuntary protective custody at Shawangunk, the time he spent there is not considered for the foregoing reasons. In addition, even if this Court were to include that time in the liberty interest analysis, Shawangunk's decision to place Plaintiff in involuntary protective custody would be too attenuated to be part of this Court's analysis of the procedures followed. Further, Plaintiff's time in administrative segregation at Attica is the subject of pending litigation in the Western District of New York. *See* Complaint, ¶¶ 7,8. Examining the same facts extant in that litigation could create a risk of inconsistent adjudications. *See Durkin v. Shea,* 957 F.Supp. 1360 (S.D.N.Y.1997)(staying action in New York district court in part because of pending case in California district court wherein plaintiff was identical in both cases, simultaneous action in New York would create risk of inconsistent judgments, and litigation in California had proceeded to more advanced stage.). Consequently, the Court examines only the ninety-two (92) days[5] Plaintiff spent in administrative segregation at Clinton.

■ To determine atypicality, a court will generally assess the number of inmates placed in SHU for the length of time and under the same conditions as the plaintiff. *See Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1998). Unfortunately, DOCS does not maintain data on either the number of inmates in SHU as a result of administrative segregation or the length of their respective sentences. De-

---

**4.** It should be noted that Plaintiff also asserts that there are important similarities between administrative segregation and protective custody. *See* Pl.'s Statement Material Facts at ¶ 56 ("The isolation, inability to associate with other prisoners and lack of movement of inmates housed in administrative segregation are essentially the same as those of inmates housed in the PC/IPC unit. They are both housed in a segregation unit; are confined to their cells twenty-three hours a day; communicate with each other by yelling from cell to cell; may not attend religious services; meals are served in their cells; and are not allowed

to personally participate in available vocational, educational and rehabilitative services.").

**5.** For purposes of the present motion, the Court accepts Plaintiff's allegation as to the amount of time he spent in administrative segregation. In any event, the difference between Defendants' contention that Plaintiff spent only eighty-six (86) days in administrative segregation and Plaintiff's claim of 92 days is inconsequential here.

fendants submitted data showing the number of inmates who received disciplinary sentences of varying lengths in SHU at facilities throughout the state during the period of 1991–1996. *See* Defs.' Statement of Facts, Ex. Y. Defendants' data reveals that during the period 1991–1996, of the 215,701 inmates confined in the New York State Correctional System, 19,963 inmates (or 9.25%) were sentenced to SHU for disciplinary reasons. Of that group, 2,603 inmates (or 1.21% of the total inmate population) were sentenced to a period of disciplinary confinement similar to Plaintiff's administrative segregation confinement (90–119 days). *Id.*[6] The fact that administrative segregation is utilized less frequently than disciplinary SHU, *see Lee v. Coughlin*, 26 F.Supp.2d at 633 ("The limited number, exigent circumstances, and frequent review of [administrative] segregation[ ] bespeaks [its] atypicality"), may lead a court to find that Plaintiff's confinement for either 86 or 92 days at Clinton SHU was atypical.

This, however, would cause a court to conduct the inquiry without the appropriate contextual reference. In order to give rise to a liberty interest, under the circumstances presented, the confinement must be the type of "atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin*, 515 U.S. at 486, 115 S.Ct. 2293. Given the facts presented here and the teachings of *Sandin*, this Court holds that Giano's confinement in administrative segregation does not fall within the limited ambit of cases encompassed by *Sandin*.

As a preliminary matter, Giano is serving a sentence for six (6) felonies, the longest term involving a sentence of twenty-five (25) years to life for murder in the second degree. Prior to Giano's first day in the New York Department of Correctional Services, he attempted an escape from the Nassau County courthouse, severely injuring several court officers in the process. In December, 1986, Plaintiff and two other inmates successfully escaped from Sing Sing. He was sentenced to five (5) years in the SHU as a result of the escape. A few months after Giano was released, he was stabbed in the back by another inmate. These are the facts with which Defendants were faced when Plaintiff arrived at Clinton during the summer of 1990.

■ Without assessing the merits of their decision to place Plaintiff in administrative segregation or their decisions to continue Plaintiff's confinement thereafter, it is important to note that state officials who manage the volatile environment of correctional facilities are afforded great deference in establishing conditions of incarceration. *See Wolff*, 418 U.S. at 561–63, 94 S.Ct. 2963. As a result, the Supreme Court has "repeatedly said … that lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt*, 459 U.S. at 467, 103 S.Ct. 864. In that vein, this Court notes that in *Sandin* the Supreme Court advocated a "return to the due process principles … correctly established and applied in *Wolff[v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)] and *Meachum[v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)]." 515 U.S. at 483, 115 S.Ct. 2293. This point is noteworthy here because in *Wolff*, the Court based its analysis on two fundamental tenets. First, the *Wolff* Court noted the balance that must be achieved when reviewing constitutional necessities in the prison context in that "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." 418 U.S. at 556, 94 S.Ct. 2963. Second, and more important for purposes of the instant case,

---

**6.** The difference would be insignificant if Defendants' claim that Plaintiff spent only 86 days in administrative segregation was used instead. See Defs.' Statement of Facts, Ex. Y

(2,065 inmates sentenced to disciplinary SHU for a period of 60–89 days, or .96% of the total inmate population).

the Court recognized that a prisoner has a liberty interest of "real substance", *id.* at 557, 94 S.Ct. 2963, in the limited circumstance when a state statutorily creates a right and concomitantly provides that a deprivation thereof "is a sanction authorized for major misconduct . . . ." *Id. Meachum* subsequently delineated the limited occasions in which to apply the "due process principles . . . established and applied in *Wolff* . . . ." *Sandin,* 515 U.S. at 483, 115 S.Ct. 2293. In particular, the Court differentiated the situation presented in *Meachum* from that presented in *Wolff* in the following manner:

> Here, Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct. Insofar as we are advised, transfers between Massachusetts prisons are not conditioned upon the occurrence of specified events. On the contrary, transfer in a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff v. McDonnell* is totally nonexistent in this case.

427 U.S. at 226–27, 96 S.Ct. 2532.[7]

Given the above, one implication of the *Sandin* Court's decision to follow those two cases is that a state statute or regulation could create a liberty interest for due process purposes only if that statute or regulation affirmatively created a right and then made the deprivation thereof subject only to limited circumstances; in particular, a disciplinary action against the prisoner. A cursory review of the *Sandin* decision, however, reveals that this cannot be so. Strictly following *Wolff* would not

require an examination of the duration or conditions of the prisoner's confinement relative to those of the general population. Yet, these are precisely the factors into which the *Sandin* Court inquired. One can reconcile the application of *Wolff* with *Sandin*'s instruction that a prisoner's confinement animates due process concerns if such confinement "presents the type of atypical, significant deprivation in which a state might conceivably create a liberty interest", *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293, if that instruction is read to mean that a liberty interest arises even in the absence of positive law if the duration and conditions of confinement are so rarely experienced by prisoners as a whole, and effect such a significant deprivation, as to raise the expectation of being free of such a restraint to a level at which it has "real substance." In effect, such a regime would be the equivalent of one in which the state has enacted a statute that creates a right and then restricts the circumstances in which one may be deprived of that right. As one can imagine, this will be manifest in only limited situations.

Read in this light, Giano's claims fail as a matter of law. After his escape from Sing Sing, Giano was sentenced to five (5) years of SHU. It is beyond peradventure that the administrators at Sing Sing were free to impose such a penalty. Giano's early release from SHU due to good behavior was not the equivalent of a state-created right to remain free from segregated confinement for the remainder of his sentence. Nor was it the equivalent of a state law or regulation that provided for re-admission to SHU only for disciplinary purposes. It is perspicuous to this Court that New York State would not promulgate a statute or regulation to the follow-

---

**7.** Instead, the *Meachum* Court based its decision on the proposition that even a significant change in conditions does not implicate the Due Process clause as such. Specifically, the Court held that a prisoner did not have a liberty interest in being free from a transfer to another facility even if the transfer effected a substantial change in the prisoner's condi-

tions of confinement. 427 U.S. at 225, 96 S.Ct. 2532. Indeed, the *Sandin* Court supported a return to *Meachum* even though the change in conditions plaintiff suffered in *Meachum* was later characterized as a "grievous loss." *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976).

ing effect: "No prisoner who successfully escapes from a maximum security prison and receives a sentence in a SHU as a result thereof shall be placed in segregated confinement upon transfer to a new facility unless said prisoner is the subject of a disciplinary action." While Plaintiff's contention that he should not be repeatedly or continuously penalized for the same offense is well taken, the ninety-two (92) days he claims he spent in administrative segregation simply do not rise to the level of atypical, significant hardship contemplated by the Supreme Court in *Sandin.* Consequently, Plaintiff cannot make out a claim for a liberty interest implicating due process concerns.

Accordingly, Defendants' motion for summary judgment is hereby GRANTED; Plaintiff's cross-motion for summary judgment is hereby DENIED; and it is further ORDERED that this case is hereby dismissed.

IT IS SO ORDERED.